## Stevers *v.* Peoples Mutual Accident Insurance Association, Appellant.

[Marked to be reported.]

*Insurance—Accident—Loss of foot.*

An accident policy insuring against involuntary, external, violent and accidental injuries and not against disease of any kind, or against disabilities which are the result, wholly or in part, of disease or bodily infirmities, and providing for a stipulated indemnity for partial permanent disablement which is defined to be the loss of one hand or foot or both eyes, does not cover the case of indemnity for an injury, where the foot is not lost or injured and it may be used constantly by means of an appliance of a plaster jacket to the spine, although the foot could not be used if the appliance were removed.

Argued April 21, 1892. Appeal, No. 395, Jan. T., 1892, from judgment of C. P. Huntingdon Co., May T., 1891, No. 34.

on verdict for plaintiff, in assumpsit on policy of accident insurance.   Before PAXSON, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL and HEYDRICK, JJ.

On the trial, before FURST, P. J., the evidence was to the effect, *inter alia,* that, on May 24, 1890, plaintiff, while helping to lift a pump, sprained his back.   On Sept. 16, 1890, while driving rapidly over a rough place in a public road, he received a wrench or concussion of the spine, which resulted in a few days in the loss of the use of his left leg.   This condition continued until he was encased in a plaster jacket, described in the opinion of the Supreme Court.   Without this jacket he could not use his left leg or foot.   This action was brought for total permanent disablement and for partial disablement caused by the accident of Sept. 16, 1890, and for weekly benefits, under the policy of insurance, which contained the following provisions, *inter alia :*

" The principal sum in this certificate of membership not to exceed $5,000, . . . to be paid . . . . after . . . . proof, . . . . that the member at any time within the continuance of this certificate shall have sustained bodily injury effected through involuntary, external, violent and accidental means, within the intent and meaning of this certificate and the conditions herein contained and complied with, and such injuries directly, wholly and alone, independently of all other causes, shall occasion death within ninety days from the happening thereof ; or if the member shall sustain bodily injuries by means as aforesaid which shall, independently of all other causes, immediately and wholly disable and prevent him from the prosecution of any and every kind of business pertaining to the occupation under which he is rated and accepted membership, he shall be indemnified against loss of time caused thereby and shall receive a weekly relief, not to exceed $25 per week and shall receive like weekly relief for such period of continuous total disability as shall immediately follow the accident and injuries, not to exceed, however, twenty-six consecutive weeks from the happening of such accident.

" The relief for total permanent disability, viz., the loss of both hands, both feet or hand and foot, by means as aforesaid, within sixty days from the date of injury shall not exceed $5,000.

" The relief for partial permanent disablement, viz., the loss of one hand or foot or both eyes, by means as aforesaid, within sixty days from the date of injury shall not exceed $2,500; and the relief for the loss of one eye, by means as aforesaid, within sixty days from the date of injury shall not exceed $650. . . . .

" For partial or total permanent disablement or a complication of injuries the payment of the weekly benefits for the severest injury shall be in full satisfaction of all claims for said injuries." . . . .

The 5th condition of the policy is given in the opinion of the Supreme Court, where further facts and evidence appear.

One of defendant's points, refused, was as follows :

" 2. If the court should feel that there is any question to be submitted to the jury, then the only right to recovery is based on the clause in the certificate, entitling the insured to weekly indemnity, the maximum being twenty-six weeks at twenty-five dollars per week, and if the jury believe the plaintiff resumed his professional work within that time, the running of the time is stopped by his resumption of his work, and he would only be entitled to recover on that basis. *Answer :* Refused as stated ; the case must be submitted also upon partial permanent disablement."

The court charged the jury as in the opinion of the Supreme Court, and, *inter alia,* as follows :

" [If the jury find from the evidence, and under the instructions we have given them, that the accident of Sept. 16 was involuntary ; that of itself, independent of all other causes, it caused the injury from which the plaintiff suffers ; that that injury resulted in the paralysis of his left foot ; and that he has no use thereof by reason of the injury, except what little use he obtains by means of artificial contrivances or appliances, as we have already stated, the jury might find in favor of the plaintiff.] [5] . . . .

" You can render one of three verdicts. [You can find generally for the defendant. On the other hand, you can find in favor of the plaintiff, if the evidence satisfies you of the loss of the use of his foot, the sum of twenty-five hundred dollars, with interest to be calculated thereon from the proper time ; or, if you are satisfied that he has not permanently lost the use of the foot, but that he suffered continuous total disability

arising from the injury, you can find for him for the sum of twenty-five dollars per week for the number of weeks that that disability continued, not exceeding twenty-six weeks.] [6] . . . . "

Verdict for plaintiff for $2,661.25 and judgment thereon. Defendant thereupon appealed.

*Errors assigned, inter alia,* were (2) refusal of point, quoting point and answer; (3) not directing verdict for defendant; (4) portion of charge in opinion of Supreme Court; (5, 6) portions of charge in brackets above, quoting them.

*George B. Orlady,* for appellant.—There was no evidence of a total permanent disablement by the loss of one foot, or even of the loss of its use. The case presents the anomaly of a recovery for the total loss of a foot, while the insured still uses that member as freely and fully as the other one not claimed to be injured.

The injury of May 24th was the originating cause and was the continuing cause at the time of the second injury, which latter was the direct result of plaintiff's own negligence. It is a traveler's duty to avoid known dangers: Forks Twp. v. King, 84 Pa. 230; Pittsb. S. Ry. v. Taylor, 104 Pa. 306; Hill v. Tionesta Twp., 1 Adv. R. 178.

An accident is an injury which happens by reason of some violence, casualty or *vis major* to the assured without design, consent or voluntary co-operation; an unusual and unexpected result attending the performance of a usual or necessary act: not such a result as is detailed by plaintiff, as his injury was induced by his own act, which he could control. Electing to drive hurriedly over a rough country road in broad daylight and which he was well acquainted with, surely cannot be called an accident, as every day common sense would expect just such results from such risk and exposure: 1 A. & E. Ency. of L. 87.

There was no affirmative proof of what the injury was in fact. The furthest any witness went was in stating an inference which in his judgment would in the future produce a certain result.

The injury complained of was not such as is contemplated by the certificate: Hollobaugh v. Peoples Mutual Accident Ins. Asso., 138 Pa. 595.

The " visible and external evidence of injury " required by the certificate is not met in plaintiff's proof.

The injury complained of was not caused through involuntary, external, violent and accidental means within the intent and meaning of the contract: 2 May, Ins., 575.

*John M. Baily*, and *W. H. Woods*, with him *J. S. Woods*, for appellee.—The business of the company is to insure against accidents. The terms of the policy are broad enough to make the company liable. Where a party uses an expression of his liability having two meanings, one broader and the other more narrow, and each equally probable, he cannot after an acceptance by the other contracting party set up the narrow constuction: 2 Wh., Cont., § 670.

The meaning of loss of a foot is an actual and entire loss of its use as a member of the body, and if its use is actually destroyed so that it will perform no function whatever, as in case of paralysis, it is a lost foot. The loss of an eye certainly means the loss of sight, and not the eye itself. Where conditions in a policy are so expressed as to be capable of two meanings they should be held to have the meaning most favorable to the insured: Burkhard v. Travelers' Ins. Co., 102 Pa. 262. An accidental strain, resulting in death, is an accidental injury: North American Life & Accident Ins. Co. v. Burroughs, 69 Pa. 43.

A policy must be so construed as not to defeat, without a plain necessity, the claim to indemnity which in making the insurance it was the object of the insured to secure. An insured, who had but one eye, recovered for its loss, on a policy insuring against the total and permanent loss of the sight of both eyes: Humphreys v. Nat. Benefit Ass'n, 139 Pa. 264. The loss of the use of the feet was held to be the loss of two entire feet, in Sheanon v. Pacific Mutual Life Ins. Co., 77 Wis. 618.

The authorities on the question of contributory negligence cited by appellant have no application to an accident policy. Besides, the questions of negligence, proximate cause, etc., were submitted to the jury and found in favor of plaintiff.

OPINION BY MR. JUSTICE GREEN, July 13, 1892.

This action was brought upon an accident policy, and the

claim of the plaintiff was, to recover the maximum amount of $2,500, for a partial permanent disablement. If, under the evidence, a recovery can be had at all for that species of disablement, the judgment of the learned court below should stand. The language of the policy which authorizes a payment of $2,500, for such an injury, is in these words :

" The relief for partial permanent disablement, viz., the loss of one hand or foot or both eyes, by means as aforesaid within sixty days from date of injury shall not exceed $2,500."

The policy defines the meaning of the expression " partial permanent disablement." It is, " the loss of one hand or foot or both eyes." The plaintiff was not affected as to his hands or eyes and he did not lose a foot in the sense of a physical severance of a foot from the leg. Yet it was contended in the court below, and the court held, that a physical severance of the foot was not necessary to entitle the plaintiff to recover.

On this subject the court charged as follows :

" The evidence shows there has been no amputation of the foot; yet if the jury believe from the testimony that the foot, by reason of the injury and the paralysis, is entirely useless to the plaintiff; that he has no use thereof; that without artificial means he would be almost or entirely unable to move around; that it is only by artificial means, the plaster jacket, that he is able at all to use his foot and that if the jacket were dispensed with, he would be a helpless cripple, we say to you that that would be, to our mind, satisfactory evidence of the loss of the foot even though it be not amputated."

This and other similar language in the charge was assigned for error and presents the main subject for decision.

Upon recurring to the evidence we find that in point of fact the plaintiff sustained no direct injury to his foot or his leg. They were both as whole and entire after the accident as before. The injury, as claimed by him, was sustained while riding in his wagon over a rough road, by his being jolted from one side of the seat to the other, and the muscles or ligaments of the back near the lower end of the spinal column being strained or wrenched severely, so as to cause him great pain and suffering, by reason of which he was subsequently deprived of the use of his left leg and foot, except by the application of an artificial device called a plaster jacket. This jacket, as

described in the testimony, was applied around his body in such a manner as to cause the weight of the body to rest upon the hips and thereby relieve the affected parts, of the pressure upon the spinal column, and consequent soreness and pain. Soon after commencing the use of this contrivance the condition of the plaintiff improved so that he was finally enabled to resume the practice of his profession and to go about visiting his patients riding in his wagon, or on the cars, or walking to some extent. It is surprising that very little testimony was given as to the extent of his power of locomotion on his feet. The plaintiff did not say and was not asked whether he could walk without a cane or a crutch, or whether he was able to go about freely on foot, whether he was obliged to limp, or whether he suffered any pain in ordinary walking, when he had on his plaster jacket. He did testify that without the jacket he was entirely disabled and could not use his left leg or foot, and he was supported in this by the testimony of the physicians who were examined on his behalf. He also testified that he could not sleep at night without pain if he laid off the jacket. One jacket would last about two months and then had to be renewed. It must be conceded that, under the testimony, he could not use his left leg or foot without the assistance of the plaster jacket, and that without it his foot was comparatively useless to him. Just what he could do and did do, by using the jacket, is not so clearly described in the testimony as it might be, but some idea may be gained of this by an examination of portions of the evidence. The plaintiff testified that he had continued in the practice of his profession from the first of January, 1891, to the time of the trial, Feb. 16, 1892, that after the month of June, 1891, his professional income was at the rate of $1,500 a year and that it was improving. He was asked: " Q. When were you first able to go about the house and prescribe for your patients? A. Well, about the beginning of December, 1890. Q. And you have attended to your professional duties in that way from that time since? A. Yes, sir. Q. How frequently have you been to Huntingdon within that time? A. Well, whenever I had any business; I couldn't approximate. Q. Half a dozen times? A. It might have been. Q. About the same number of times as during the eighteen months preceding the accident? A. No,

oftener.  Q. Oftener since?  A. Yes, sir.  Q. Have you been riding in a buggy?  A. Why, occasionally.  Q. On horse back?  A. No, sir.  Q. Did you ever ride horseback?  A. Yes, sir.  Q. Prior to the accident?  A. Yes, sir.  Q. Have you been riding in the cars?  A. I have rode in the cars.  Q. Have you been walking around town?  A. I don't walk much; walking is the worst thing I have to do; I can do anything else better than walk.  Q. You can't walk straight?  A. I can't stand erect; yes, sir."

He was also asked in re-examination: " He has asked you about your practice since January 1st, 1891; what enables you to practice at all?  A. Well, by the artificial means of support I am able to go about and do some work.  Q. Without that artificial means of support could you practice?  A. I could not.  Q. Without that artificial means of support what effect would it have on both limbs?  A. They would be useless."

He also testified that his appetite and digestion were good, that he weighed nearly two hundred pounds and that he had not the appearance of an invalid.

Dr. Dercum, a witness for the plaintiff, testified: " Q. As to the extent of the permanent condition in your opinion is it total or partial?  A. It is not total in the sense that it prevents him from walking; it is partial as regards enabling his getting about: I should qualify that by this statement that the back being maintained in its condition of relief, rest, by the jacket that he wears and which he wore at the time I examined him—he had removed it for a little while and put it on again—whilst the spine is kept more or less at rest the pain is less both in the back and in the leg, and during that time he could get around tolerably well, at least he seemed to move around in my office. . . . . Q. It is a weak back?  A. Yes, sir.  Q. He uses both legs with average movement?  A. Yes, sir.  Q. He steps forward with each leg alike?  A. Yes, sir.  Q. Turns and moves the body?  A. Yes, sir; he did this though when I spoke to him and he then stood alone upon one leg and the other; he stood very steady on the right leg and badly on the left."

Dr. Barnhart, another witness for the plaintiff, who attended him, was asked: " Q. After the application of the jacket and its use the doctor commenced to improve?  A. Yes, sir.  Q. He was able to get up and move himself around?  A. Yes sir;

that is after a few weeks.  Q. Or after the first of December I think?  A. Yes, sir."  He further testified that he made his last examination about a year later and found that the plaintiff's condition had improved and his general health was better.

Dr. James, another of plaintiff's witnesses who attended him, after describing his condition and the treatment used, said: "I couldn't tell whether it was the nerve or a ligament or a tendon torn off; I didn't get down to see; you can't tell that; it was evident there was something there, that one of these was injured to a certain extent.  Q. From that time on under your treatment he continued to improve until he was able to walk around?  A. Under the plaster paris treatment he continued to improve steadily.  Q. And partially recovered his health so that he is able now to move around and go from his house to town and to the railroad station and on the cars to come to town :  Is that correct?  A. Well, I see him moving around certainly, but he still has his jacket on."

There was much medical testimony as to what was the precise character of the plaintiff's injury.  It was thought there was some atrophy of the muscles and Dr. Dercum thought there was pain in the sciatic nerve extending down the leg, and all agreed that without the artificial support of the plaster jacket he would become helpless, and also that with it he could move around on his feet with more or less freedom and could carry on the practice of his profession including the visiting of his patients.  It is beyond all question that the plaintiff was severely and painfully injured and that without artificial support he would probably become helpless and unable to use his limbs.  Under this state of the testimony the question recurs, and it is the one leading question of the cause, can there be a recovery under the particular contract between these parties for a lost foot?  It is only for the loss of a foot that there can be any recovery of any kind in this action.  The policy insures only against " bodily injury effected through involuntary, violent and accidental means."

In the fifth of the numbered conditions, it prohibits any recovery of benefits for certain injuries and for the results of disease in the following words :

" Fifth. The benefits and insurance under this certificate shall not extend to any bodily injury of which there shall be no external visible signs, nor to hernia, nor to any bodily in-

jury happening directly or indirectly in consequence of any disease, nor to any death or disability which may be wholly or in part attributable to disease or bodily infirmities existing prior to, or happening subsequent to the date of this certificate ; or poison in any form or manner, or the coming in contact with any poisonous substances, or any other cause except where the injury is the approximate and sole cause of disability or death."

It will be perceived therefore that the policy in suit insures only against involuntary, external, violent and accidental injuries, and not against disease of any kind, nor against disabilities which are the result wholly, or in part, of disease or bodily infirmities. And for the purposes of the present case the only injury for which there can be any recovery within the terms of the policy is the loss of one foot. Now, in point of fact, as has been already stated, the plaintiff has not lost a foot. So far as the evidence goes both his feet are in perfect natural condition. His left foot is the only one in question and in reality it has received no injury of any kind, external or internal. So far as all its physical functions are concerned as a member of his body, it is entirely capable of use if the other parts of his body, which can or may affect its use, are in proper condition. It is not proved, or even alleged, that any of the muscles, tendons or nerves of the foot, are injured in any manner. The source of the difficulty does not lie in the foot nor in the leg. It is in another part of the body, to wit, the back. Just what the actual physical injury or difficulty was, is not precisely stated in the medical testimony. It is uncertain. It is supposed to be some injury to a muscle, or ligament, or nerve, or nerve centre, or to the vertebræ of the spinal column. The physicians have different theories regarding this subject and none of them claims to know with certainty. The disability of the plaintiff did not result immediately from the injury. He went to Philadelphia the day after and remained several days, was examined and treated by physicians, returned home and on Monday following the previous Tuesday, on which the accident occurred, he became disabled while returning from his stable. Whether the disability thus arising was due solely to the injury received at the time of the accident, or partly to a diseased condition of the muscles, tendons, nerves or spinal vertebræ, might be an interesting and possibly a controlling question, but in the view we take of the case it is not

necessary to determine that question. In point of fact the plaintiff was so much benefited by the treatment he received that he was able, in December following, and from thence until the trial, to use both his feet, to walk about and attend to his business, to ride in wagons and on cars and generally to go around his house and the town as he was accustomed to do before he was injured. It is only when he removes the mechanical appliance called a plaster jacket that he becomes disabled. In such circumstances we do not see how he can be considered to have suffered the loss of a foot. He has neither lost a foot nor the use of it. He has it and he constantly uses it, and therefore it cannot be said that, because he is deprived of its use, he is entitled to be considered as having lost the foot itself. If he had suffered an attack of permanent paralysis in the leg and been thus deprived of the use of his foot he could not have recovered, as the cause of his disability would have been disease. If when he removes the jacket a paralytic condition ensues, is it not due to a diseased condition of the nerves of the back, and does that help his legal standing under the fifth clause of the conditions of the policy? We think not. But aside from that he has received surgical treatment for his injury which has been successful and has enabled him to preserve the use of his foot, and the position is not tenable that he has lost his foot within the meaning of the policy because he has lost its use. Of course if the foot had been cut off by the accident or by amputation, and he had been provided with an artificial substitute which he could use, he could recover; but that would be because he had literally brought himself within the terms of the policy by actually losing his foot. But where, as here, he has not lost his foot, and it has not even been injured, and he is enabled to use it constantly by means of an appliance which prevents an injury in another part of his body from affecting the use of the foot, we are quite clear that there can be no recovery under the contract of the parties as for the loss of a foot.

We sustain the second, fourth, fifth and sixth assignments of error.

As there is a remaining question whether the plaintiff is entitled to another sum under the policy, a new venire must be granted.

Judgment reversed and a venire de novo is awarded.