MALCOLM PETERSON v. THE MODERN BROTHERHOOD OF
AMERICA, Appellant.

**Insurance contracts:** CONSTRUCTION. It is only when the language
1  of an insurance contract is ambiguous or fairly susceptible of two
   or more constructions, that courts are required to give it that con-
   struction which will afford protection to the assured.

**Accident insurance:** BROKEN LEG: CERTAINTY OF CONTRACT. It is com-
2  petent for an insurance company to define by its contract what shall
   constitute a broken leg, and a provision limiting liability to the
   breaking of the shaft of the thigh between the hip and knee, or the
   shafts of both bones between the knee and ankle, does not include
   the breaking of one bone below the knee and the dislocation of the
   other. Weaver and Bishop, JJ., dissenting.

*Appeal from Calhoun District Court.— HON. F. M. POWERS,*
Judge.

WEDNESDAY, NOVEMBER 16, 1904.

ACTION on a certificate of membership in a fraternal
insurance company to recover a specific indemnity for the
breaking of a leg. Trial to the court without a jury.
Judgment for plaintiff, and defendant appeals.— *Reversed.*

*Blythe, Markley & Rule,* for appellant.

*C. O. Longley,* for appellee.

DEEMER, C. J.— As the case involves less than $100,
a certificate of appeal was allowed by the trial judge, and
the case comes to us in virtue of this certificate. The cer-
tificate or policy issued by the defendant company provides
that, should the member, while in good standing, accident-
ally break his leg or arm, he should receive one-tenth of the
amount his beneficiary would be entitled to recover in case

of the death of such member. It also provided, " The breaking of a leg is defined to be the breaking of the shaft of the thigh bone between the hip and knee joints, or the breaking of the shafts of both bones between the knee and ankle joints." The plaintiff sustained what is known to the medical profession as a " Pott's fracture " of the right leg, which, as usually defined, is the breaking of one bone between the knee and ankle joints, and the dislocation of the other, or, as described in this particular case by the physicians who gave testimony, as the breaking of the fibula 1½ to 2 inches above the joint, and of what is known as the " malleolus process." The physicians further said that there was " complete solution of the continuity of both bones."

The contention of appellant is that the language of the certificate limits the breaking of a leg, for which an indemnity is to be paid, to such breaking as is described in the language of the certificate, and that there was not in this case a breaking of the shafts of both bones, within the definition set forth in the contract, because the term " shaft " or " shafts " excludes the extremities of the bones and the malleolus process, which is in reality a protuberance from the head of the bone. That there is a manifest distinction between the shaft of a bone and its extremities is too clear for argument. But appellee insists that the language used in the certificate should be so construed as to cover the injury above described; relying upon the proposition that it is the duty of the court to construe the terms of every policy of insurance or benefit certificate most strongly against the insurer, and to resolve every doubt or ambiguity in favor of the insured. There is no doubt about the rule for which he contends, but the difficulty is in its application. If the language used in the certificate is ambiguous or is reasonably capable of two or more constructions, that construction should be given which will afford the insured protection under his certificate. But

1. INSURANCE CONTRACTS: construction.

the parties have the right to make contracts for themselves, and there is no authority for the court to change such contracts. To take away from parties or from persons or corporations this undeniable right of contract, or to make contracts for parties, is not within the province of courts of justice.

In the instant case, had there been no attempt at definition of what was meant by the breaking of a leg, there would be no doubt that plaintiff's injury was covered by his certificate; but here there is a definition given which is clear and unambiguous, and there is no reason why the parties may not define any term they see fit to use in their engagements one with the other. The certificate plainly says that the breaking of the shaft of both bones between the knee and ankle joint is what is meant by the term " breaking of a leg." We have no means of knowing what the insured thought when he received this certificate, and it matters little what his thoughts were in this connection, if it be found that the language used is plain and susceptible of but one construction. True, when the terms of an instrument have been intended in a different sense by the parties to it, that sense is to prevail against either party in which he had reason to suppose that the other understood it. Code, section 4617. But in construing this statute, which is simply declaratory of the common law, we have held that, if the language is plain, it cannot be used for the purpose of making the contract conform to the notions of one of the parties executing it. *Congower v. Equitable, etc., Ass'n,* 94 Iowa, 499. In another case we said that the provision is applicable only where the writing involved is fairly susceptible of different meanings. *Rouss v. Creglow,* 103 Iowa, 60. See, also, *Field v. Association,* 117 Iowa, 185.

The pivotal question in the case, then, is, is the definition of the " breaking of a leg," used in the certificate in suit, fairly susceptible of different meanings? This all depends upon what effect shall be given the use of the

words " shaft " and " shafts." Looking to the derivation of these words, we find that they mean " handle or haft; a shaven or smoothed rod." In the definition as given in the contract it is the shafts of both bones *between* the ankle and knee joint. This clearly excludes the heads of the bones, the joints themselves, or the process attached to these heads, which have distinct and definite names. · Treating the words as technical, as they no doubt are, the plaintiff is in no better position. Technical words are to be interpreted as usually · understood by persons in the profession or business to which they relate. *Gauch v. Insurance Co.,* 88 Ill. 251 (30 Am. Rep. 554); *Dana v. Feidler,* 12 N. Y. 40 (62 Am. Dec. 130). The medical profession are agreed that the shaft of a bone is something entirely distinct from the malleolus process. There is no room for any doubt as to what these words mean to the medical profession, and nothing in the record suggests that the parties did not use them in a technical sense. Even if there be a popular meaning of the term " shaft," it has not been disclosed to us; and, taking the full definition as given in the certificate itself, there are, as it seems to us, no two constructions to be put upon the language used.

There was, it is conceded, no breaking of the shafts of both bones, unless we say the protuberance from the head of one of the bones· known as the " malleolus process " is a part of the shaft of the bone between the knee and ankle joint. Manifestly this protuberance is not so located. It projects from the end of the head of the bone downward toward the heel. Doubtless the accident is more serious than if both shafts had been broken, and plaintiff needs his insurance just as badly as if they had been, but this is no reason for changing the terms of his certificate. The defendant company had the right to narrow its liability, to define the terms used in its certificates, to remove from the field of debate the character of a particular injury, or, in

*(margin note: 2. ACCIDENT INSURANCE: broken leg; certainty of contract.)*

other words, to make its own contract. Having made its contract, it is not within the province of a court of justice to change its terms to meet the equities of a particular case. Our views find support in the following cases: *Stevers v. People's Ass'n,* 150 Pa. 132 (24 Atl. Rep. 662, 16 L. R. A. 446); *Gentry v. Standard Co.,* 6 Ohio Dec. 114 (Id., 5 Ohio N. P. 331); *Maryland Casualty Co. v. Hudgins,* (Tex. Sup.) 76 S. W. Rep. 745, 64 L. R. A. 349.

The injury does not come within the terms of the certificate issued by the defendant association, and the court was in error in rendering judgment against it. For the reasons pointed out, the judgment must be, and it is, *reversed.*

Weaver, J. (dissenting).— Among the most familiar rules of the law of insurance is that which requires the courts to construe every ambiguous and doubtful provision of the policy most strongly against the insurer. The company itself frames the instrument in language of its own choosing, and it brings to that effort the skill born of experience and the aid of learned and astute counsel. The average man to whom that contract is tendered is unlearned in such matters, and he accepts it for what it seems to say; relying upon the company, or upon the agent, who is usually his neighbor, to act in good faith and furnish him the indemnity for which he pays. It is to the credit of the great majority of the companies engaged in this most necessary and useful line of business that the confidence of the insured person is not often abused, and when he suffers loss within the apparent terms of the contract his claim is promptly adjusted and paid. Unfortunately, however, this rule is not universal, and not infrequently the courts are required to deal with policies which appear to have been designed with a deliberate purpose to deceive and mislead the holders. Buried in verbiage, ambushed in small type, obscured in technical terminology, are conditions, warranties, forfeiture clauses, and restrictive definitions without limit, which no

one ever reads, nor are they intended to be read or under-
stood, until a loss occurs, when they are summoned forth
from their native darkness to defeat a recovery by the
assured, or to serve as a menace by which to force him to
a compromise of his claim.   Ordinarily the courts, when
called upon, are prompt to thwart such injustice, though
sometimes, as in the case at bar, they reach the conclusion
that the arm of the law is too short to arrest the accomplish-
ment of an admitted wrong.   The principle stated at the
outset of this dissent has been often and effectively applied,
and, in my judgment, should be invoked in the present con-
troversy.

In *Meyer v. Fidelity & Casualty Co.*, 96 Iowa, 378,
the accident policy sued upon excepted from its operation
injuries caused by " disease or bodily infirmity," and the
company defended upon the theory that the cause of Meyer's
death was within the exception.   There was evidence tend-
ing to show that he was seen to sway and stagger as if
seized with sudden illness, and fell, striking his head upon
the pavement, receiving a fatal injury.   On the trial of the
case the company insisted that the word " disease " should
be given its strict technical meaning —" any derangement
of the functions or alteration of the structure of the animal
organs "— thus necessarily including the slightest and most
temporary as well as the most serious and inveterate · ail-
ments.   To this contention we refused to yield, saying:

When speaking of an " infirmity," we · generally mean
the state or quality of being infirm physically or otherwise —
debility or weakness; and by " disease " we desire to convey
the impression of a morbid condition resulting from some
functional disturbance or failure of physical function which
tends to undermine the constitution.   In using either word
we do not, as a rule, refer to a slight or mere temporary
disturbance or enfeeblement.   *If this is true in our ordinary
speaking and writing, it is certainly clear that the words
should be given no broader meaning when we find them used
by an insurance company in a clause of its policy which it*

*relies upon to defeat a recovery thereon.* The language used is made up of words framed by the company or its legal advisers in an attempt to limit as narrowly as possible the scope of the insurance, and it is a universal as well as a fair rule, adopted by the courts everywhere, to construe the terms of the policy most strongly against the assurer, and resolve every doubt or ambiguity in favor of the assured and against the assurer.

This certainly is a most wholesome doctrine, and one which, I trust, has not yet " lost its savor."

The language which I have italicized in the foregoing quotation states, with a force not to be improved upon, the proposition of law which in my judgment controls this case — that in a policy of accident insurance the company will not be allowed to escape liability by a technical construction of any word or phrase in the contract, but, for the purpose of preserving the policy holder's indemnity, such words and phrases will be given their popular meaning, as employed in ordinary speaking and writing. Apply that rule to the present case, and the right of plaintiff to recover is too clear for argument. The appellant is here relying upon the identical proposition by which the company in the Meyer Case sought to avoid recovery. It insists, and the majority opinion sustains its contention, that what is meant by the " shafts of both bones between the knee and ankle joints " must not be sought in common usage, or in our everyday speaking and writing, but we must delve in the maze of medical and anatomical nomenclature, and observe the minute lines of demarcation by which a learned profession has mapped and charted each particular bone of the human frame into subdivisions too small to permit the inscription of their ponderous Latin names. The opinion tells us that in ordinary parlance the word " shaft " is commonly the equivalent of " handle or haft "—" a shaven or smoothed rod." We find it applied also to an architectural column; to the trunk or the main stem of a tree; to the central stem

or body of a feather; to an arrow; to the revolving bar or beam by which force or power is conveyed from an engine to various kinds of working machinery. It has many other applications, but those stated are enough to indicate that to the ordinary mind the word "shaft" conveys in a general way the idea of a body having considerable length in proportion to its diameter, more or less rounded or cylindrical in form, and continuous from end to end. Now, every person of ordinary intelligence knows that he has two bones in each lower leg; that those bones are more or less rounded in form, are comparatively straight, and continuous from knee joint to ankle joint; and, if he hears them spoken of as "shafts," his knowledge of the ordinary application of the term to other objects enables him to appreciate its aptness, but, in the absence of a technical education, he has no suspicion that the protection afforded by a policy which insures him against a breaking of these shafts can by any process of interpretation be limited to a mere fraction of the bones supposed to be thus designated. Indeed, until disaster arrives, and in his innocence he asks payment of indemnity, he will never dream that his shin bone is a "tibia," and its lower extremity nothing but a worthless "malleolus."

Even if we assume the correctness of the definition and of the illustration given in the majority opinion, I am at loss to understand how it can be fairly said that the reference in the policy to the shafts of the bones between the knee and ankle joints "clearly excludes the heads of the bones, and processes attached to these heads, having distinct and definite names." The bone is one continuous, solid structure from its upper extremity at the knee joint down to and including the extreme tip at the ankle joint, and the last inch of the tip is no less a part of the bone than is any other inch throughout its length. The long bones of the leg, when denuded of flesh, are shown to be somewhat larger at the ends than at intermediate points, and it is these en-

larged ends to which I understand the opinion refers as
" heads." The proposition last quoted is, in effect, that by
the word " shafts " the parties must be presumed to have
meant that the company should be liable for no fracture
except such as might occur in the smaller part of the bones,
between the enlarged ends; and had plaintiff sustained a
complete fracture of both bones through both heads " be-
tween knee and ankle joints," his leg would still be un-
broken, for the purposes of this case.

It is said by the majority, also, that " the distinction
between the shaft of a bone and its extremities is too clear
for argument." That there is a difference between a yard-
stick and the ends of a yardstick is admittedly evident to
the dullest intellect, but just how to effect a " complete
solution " of either " extremity " of a yardstick, and leave
that ancient standard of measure unbroken and unimpaired,
is beyond my comprehension. It appears, however, that
the appellant is the discoverer of a method by which the
seemingly impossible may be accomplished. Nor can I ap-
preciate the conclusiveness of the argument based upon the
thought that the so-called malleolus is a mere process or
protuberance from the head of the bone, and is known to
physicians and surgeons by a distinctive name. Cape Col-
ony is none the less a part of Africa because it constitutes
the small end of the continent, and has a name of its own.
Moreover, the policy itself clearly indicates that the word
" shaft " was used as applicable to the entire bone. In
speaking of a fracture of the " shafts of both bones between
the knee and ankle joints," it, in substance and effect, de-
scribes the bones to which it refers as extending from joint
to joint, or, in other words, the bones entire from one ex-
tremity to the other. That is the meaning which would be
given it by the average reader, and the insurer must be held
to have meant the phrase in the sense in which it would
appeal to such reader. The company will not be permitted
to assume that the insured person knows the technical mean-

ing of terms employed in the policy.  *Potter v. Ins. Co.,*
(C. C.) 63 Fed. Rep. 382.

That both bones of the plaintiff's leg were in fact broken,
there is no dispute.   The physician describes the injury as
a " fracture of the tibia of the right leg, broken across the
malleolus, and of the fibula three inches above the joint;
a complete solution of the continuity of both bones." This
I understand to mean that there was a complete breaking
and severance of each of both bones into two separate frag-
ments.   The fact that the lower fragment of the tibia was
small, as compared to the entire bone, is a matter of no
moment.   The breaking was complete, and plaintiff's cause
of action was perfect.   There is a noted precedent in fiction
for the thought that the smallness of the fruit of transgres-
sion may be pleaded in extenuation of the fault, but the
time has not yet arrived when we can safely recognize it as
a principle of law.

Illustrating the tendency of courts to construe policies
of insurance broadly and liberally, in the interest of the
assured, I call attention to a few of the many precedents.
Under a policy insuring against the accidental loss of " two
entire feet," a recovery was had on proof that the assured
received a gunshot wound in the back, producing total
paralysis of both legs and feet.  *Sheanon v. Ins. Co.,* 77
Wis. 618 (46 N. W. Rep. 799, 9 L. R. A. 685, 20 Am. St.
Rep. 151).   Under an insurance against a like loss of an
" entire hand," recovery was sustained on proof that a
" little over one-half the hand, anatomically speaking," had
been lost by an accidental injury.  *Sneck v. Ins. Co.,* 88
Hun, 94 (34 N. Y. Supp. 545).   Under a similar policy,
it was shown that the assured had lost three fingers wholly,
and part of the fourth, and that the joint of the thumb was
destroyed.   Contending for the literal construction of the
policy, the company insisted that it required the amputation
of the member at or above the wrist, to constitute the loss
of an entire hand; but the court held that this " would be

too much of a refinement upon language for practical purposes," and sustained an instruction submitting the question to a jury. *Lord v. Ins. Ass'n,* 89 Wis. 19 (61 N. W. Rep. 293, 26 L. R. A. 741, 46 Am. St. Rep. 815) ; *S. C. of Honor v. Turner,* 99 Ill. App. 310. Bearing in the same direction, see *Corbett v. Ins. Co.,* 85 Hun, 250 (32 N. Y. Supp. 1059). A condition against liability of the company for death or injury by the " inhalation of gas " has been held to refer solely to a voluntary inhalation, and recovery upheld for the death of a policy holder by suffocation by gas in a well. *Pickett v. Ins. Co.,* 144 Pa. 79 (22 Atl. Rep. 871, 13 L. R. A. 661, 27 Am. St. Rep. 618). To same effect, *Paul v. Ins. Co.,* 112 N. Y. 472 (20 N. E. Rep. 347, 3 L. R. A. 443, 8 Am. St. Rep. 758). An exception of death caused by " poison in any way taken, administered, absorbed or inhaled," does not prevent recovery for a death caused by poison accidentally taken. *Metropolitan Acc. Ass'n v. Froiland,* 161 Ill. 30 (43 N. E. Rep. 766, 52 Am. St. Rep. 359) ; *Travelers' Ins. Co. v. Dunlap,* 160 Ill. 642 (43 N. E. Rep. 765, 52 Am. St. Rep. 355) ; *Penfold v. Ins. Co.,* 85 N. Y. 317 (39 Am. Rep. 660). Where the insurance was against " total and permanent loss of eyesight," the assured was permitted to recover on proof of the total and permanent loss of one eye. *Maynard v. Ins. Ass'n,* 16 Utah, 145 (51 Pac. Rep. 259, 67 Am. St. Rep. 602). In the last case cited the court says: " The terms of the by-law in question must be interpreted liberally and reasonably, and, as they appear to be susceptible to two constructions, that must be adopted which will more nearly carry out the benign purpose of the association and sustain the claim of the injured member. The provision will not be scrutinized for the purpose of enabling the organization to escape liability to any of its members." Insurance against injury by which the assured is " totally disabled; absolutely, necessarily, and continuously confined to the house "— will sustain a recovery on proof of total disability for labor, although the injured per-

son remained most of the time in the open air.  *Scales v. Association,* 70 N. H. 490 (48 Atl. Rep. 1084).  The court there argues that it was unreasonable to suppose that company intended its language to be understood literally, and adds, " Such supposition cannot be entertained without an accompanying inference that the defendant intended to deceive."  Under a policy insuring against death by " external, violent, and accidental means," and excluding all " injuries from poison or anything accidentally or otherwise taken, administered, absorbed, or inhaled," a petition alleging that the assured came to his death by swallowing hard, pointed, resistant substances of food, which perforated his intestines, already weakened by disease, was held to state a good cause of action.  *Miller v. Fidelity & Casualty Co.* (C. C.) 97 Fed. 836.  A real estate and loan broker, who held a policy against loss of time which shall " immediately and wholly disable and prevent him from prosecuting any and every kind of business pertaining to his occupation," suffered the dislocation of a shoulder.  He was able to go to his office every day and give orders and directions to his assistant, but did no other work.  It was held there was no error in submitting the claim to a jury.  *Turner v. Fidelity & Casualty Co.,* 112 Mich. 425 (70 N. W. Rep. 898, 38 L. R. A. 529, 67 Am. St. Rep. 428).  See, also, *Young v. Ins. Co.,* 80 Me. 244 (13 Atl. Rep. 896).  In the Turner Case the court restates the familiar rule as follows: " Where a stipulation or exception to a policy emanating from the insurer is capable of two meanings, the one is to be adopted which is most favorable to the insured."  The policy should " be so framed with such deliberate care that no form of expression by which, on the one hand, the party insured can be caught, or, on the other, the company be cheated, should be found on the face of it."

The foregoing are a few of very many cases, all of which deny the right of an insurance company to escape liability on its policy by strict or technical interpretation of its lan-

guage. In not one of the cases referred to could the policy
holder have recovered, had the court permitted the contract
to be interpreted strictly and technically, according to its
literal terms, as this court proposes to interpret the policy
now before us. In all of the decisions which it has been
my privilege to examine upon this subject, I have failed to
find a single example in which the facts called more loudly
for the application of the rule thus approved than does the
one at bar. This controversy involves but a trifling sum of
money, and would not justify the time here given to its
attention but for the precedent which it establishes. It is
a matter of common notoriety that in the wake of legitimate
insurance, which is the development of centuries, there has
sprung up within recent years a countless horde of unsub-
stantial schemes, represented by swarms of persuasive agents
and promoters, by whom a very large proportion of the peo-
ple has been wheedled into purchasing so-called indemnity
against all the ills to which flesh is heir. Many millions
of dollars have been expended upon these glittering schemes
by wage earners and small property holders, only to find
concealed within their contracts some unsuspected condition
which renders them valueless in the hour of misfortune, or,
if perchance the contract be perfect in form, to find that the
entire assets of the insurers are represented by an office desk
filled with finely engraved stationery and advertising matter,
describing with florid laudation the benevolent, fraternal,
and unselfish character of the enterprise. I do not wish
to be understood as placing the appellant company in this
class. The record before us is very brief, disclosing but
few facts, and the company is entitled to the benefit of the
general presumption of good faith which attaches to all
ordinary business transactions. This charitable presump-
tion in which the law indulges also compels us to assume
that, in framing its contract, the appellant used the words
which we have been considering in the sense in which it must
have known the plaintiff would understand them, and not

in the technical sense in which it now asks the court to interpret them. To adopt any other theory would make necessary the inference that it deliberately intended to deceive.

The suggestion in the majority opinion that the company had the right to make its own contract is true in a restricted sense only. In few, if any, lines of business have Legislatures and courts gone further in restricting and regulating contract rights and relations than in matters pertaining to insurance. The peculiar nature of the business has not only justified, but compelled, the interposition and exercise of this power of regulation and supervision for the protection of the public, and we should be careful not to relax our insistence upon every rule by which that protection is made effectual.

In my opinion, the judgment of the district court should be *affirmed*.

BISHOP, J.— I concur in the conclusion reached by WEAVER, J.