## CONSTRUCTION OF THE WORKMEN'S COMPENSATION ACT.

Common Pleas Court of Cuyahoga County.

JOHN VAYTO V. THE RIVER TERMINAL & RAILWAY COMPANY; AND
K. CHARLES SCHMIDT V. THE INDUSTRIAL COMMISSION OF
OHIO; AND JACOB SMITH V. THE AMERICAN STEEL & WIRE
COMPANY.

Decided, July 9, 1915.

*Workmen's Compensation—Right of Injured Employee to Sue a Party
Other than His Employer—Meaning of the Phrase "Course of Em-
ployment"—Assumption of Risk—Pleading—Lawful Requirements
by the Industrial Commission—Penal Character of the Compensa-
tion Act—Negligence Thereunder—Employer Not an Insurer of the
Safety of the Place of Employment—Negligence of Employer
Through Acts of Omission or Commission.*

1. The workmen's compensation acts in no way, or in any manner, or
in any sense, take away the right to sue and recover damages from
a person other than his employer, who may have negligently in-
flicted injury upon him while in the course of his employment.

2. Under the compensation acts, "course of employment" is not so
restricted as under the general doctrine relating to scope of em-
ployment. The general rule relating to course of employment un-
der compensation acts may be thus defined: If the employee at
the time of the injury was doing something he was authorized to
do, or which may be fairly inferred or implied from the nature of
his employment and the duties incident to it, he may be said to
have been in the course of employment. Or it may be stated some-
what differently—was the servant at the time doing an act in
furtherance of the master's business?

3. Whether the defense of the assumption of risk remains with the
employer guilty of a wilful act or failure to comply with all lawful
requirements for the protection of the lives and safety of em-
ployees is at least doubtful. Upon the assumption that statutes in
derogation of common law rights must be strictly construed, it
would seem that the right remains, as it is not expressly denied.
Upon the theory that a wilful act or a failure to comply with any
lawful requirement for the protection of employer, places the em-

ployer outside of the scope of the act and denies him the rights guaranteed by the act, it would appear he is to be treated under these circumstances as if the act never existed; and unless the defense of assumption of risk is denied by the Norris act or other related statutes, it remains.

4. The statute makes the finding of the commission on the question of course of employment final, and it can not be disturbed.

5. Whether the employer is a non-contributor or a contributor to the fund, or a direct compensator, ought to be stated in the petition, as a different rule applies to two of these classes. If a non-contributor, the defendant can not avail himself of the defense of the fellow-servant rule, assumption of risk, or contributory negligence. If the defendant is a contributor to the fund or a direct compensator, the action can only be maintained if the act causing the injury was wilful or if the injury arose from a failure to comply with some lawful requirement for the protection of the lives and safety of employees. If this is the ground upon which recovery is sought, the defenses of contributory negligence and the fellow-servant rule are available to the defendant.

6. The act provides that the commission shall have power to prescribe hours of labor, provide for safety devices and safeguards, and make and promulgate orders and general orders for the protection of the lives and safety and general welfare of employees; and these orders may become "lawful requirements" under certain conditions, under the compensation act.

7. The Ohio statute is penal in character, and it seems that acts criminal in nature ought to be clearly specified by legislative enactment.

8. The violation of a penal statute does not, in itself, necessarily furnish ground for a civil action, unless the violation of the statute is the proximate cause of the injury complained of; that is, if the act which causes the injury is made unlawful by statute, then the violation of the statute is negligence for which recovery may be had in a civil action. And if the violation is that of an act which imposes an absolute and positive duty, and the injury results proximately from and because of the violation, it is negligence *per se.*

9. The decision of the Lucas county court of appeals in *American W. M. Co.* v. *Schorling,* where the acts of negligence charged were those mentioned in Sections 15 and 16 of the act of March 18, 1913 (103 O. L., 95), to-wit: failure to furnish safe employment, safe place to work, to provide and use safety devices and safeguards and to use methods and processes reasonably adequate to render the employment and place safe, should be followed.

10. What specific acts of omission or commission on the part of the employer constitute a failure to comply with lawful requirements so as to bring an employee within the exception or reservation under Section 29 of the compensation act, must be determined by the court under the facts in each case. Only ordinary care will be expected in respect to these requirements, and the doctrine of *Railway Co.* v. *Frye*, 80 O. S., 289, that the limit of the employer's duty is to exercise reasonable and ordinary care having due regard to the hazards of the service, to provide an employee with a safe place in which to perform his work, must be applied.

11. It can not be held, without absolute danger to all industry, that an employer is an insurer of the place of employment, the safety of the employment and safety devices and safeguards unless they are specifically named, or the methods or processes employed unless they are named by statute.

12. Even under the act of June 15, 1911. a minor working at an age legally permitted under the laws of the state, is *sui juris* and having made application to the state liability board of awards for compensation, can not thereafter disaffirm his election on the ground of minority.

FORAN, J.

These cases and seven others are before the court on motions and demurrers which involve the construction of what is popularly known as the workmen's compensation law, or an act of the General Assembly of the state of Ohio entitled "An act to create a state insurance fund for the benefit of injured and the dependents of killed employees," approved June 15, 1911, and amended as approved March 14, 1913, as well as subsequently passed related enactments.

To rightly understand the purpose, scope and object of these enactments, a brief review of some of the causes which culminated in their adoption may throw some light upon the construction that should be given their provisions.

From about the middle of the nineteenth century the doctrine of common employment made it extremely difficult for a servant or workman, independently of statutory regulation, to recover from a master or employer for a personal injury received in the course of his employment, unless the injury was caused by the negligence of the master himself. In the operation

and enforcement of the rule it became increasingly difficult, even for courts, to precisely define what constituted a common employment. The courts devised, if they did not invent, a test upon which it was claimed the doctrine was based, and that is, that the servant, by virtue of his contract of employment, consented to assume or run all the risks incidental to the service, including the risk of negligence of fellow-servants; and in addition to those defenses the employer could rely upon contributory negligence of the injured servant, which, if a proximate cause of the injury, protected the master, even if he was negligent in the premises.

Under the doctrine of common employment, contributory negligence, and that expressed in the maxim, *volenti non fit injuria*, which perhaps may be all expressed under the term common employment, it became almost impossible for workmen injured in the course of their employment to recover compensation or damages.

The injustice of the rule was not so severely felt while industries were conducted upon a comparatively small scale, but when the mill, shop and factory system assumed gigantic proportions under modern industrial conditions, the hardships and injustice of the doctrine of common employment became so grave and serious as to demand legislative attention and action.

In 1880 England passed an employer's liability act, which was shortly thereafter copied almost literally by Massachusetts, Wisconsin, Alabama, New York and other states. These acts applied largely, however, to selected industries, and their effect was to abridge, if not destroy, the doctrine of common employment in a few specific cases. In Ohio the act of April 2, 1890 (87 O. L., 150), was passed for the protection of railroad employees, and largely added to the common law rules of liability. 51 O. S., 130.

Other enactments prior and subsequent to this act for the protection of workmen were passed by the General Assembly of Ohio, such as provided for the guarding of dangerous machinery, places and ways, the erection of scaffolds, providing sufficient light in certain places, defining what is meant by superior serv-

ant, and granting relief notwithstanding negligence of fellow-servants.

The legislation in this direction finally culminated in the act of May 12, 1910, sometimes called the Norris act. Many of the provisions of this act are merely declaratory of the common law, statutory and precedent law as it existed at the time. Many new things, however, including the doctrine of comparative negligence, are found in this act.

This remedial legislation, however, did not prove a panacea for existing evils and others that arose coincident with and subsequent to it. The employers sought protection under the folds of liability insurance. The service of the lawyer trained and skilled in the law of torts became less imperative; the iron rule of the demurrer and the non-suit became less effective; but between the unfair methods and the pernicious activities of the agents of the casualty companies and the exactions of the fifty per cent. contingent fee lawyers, both the employers and the workmen were ground as between the upper and nether mill-stones of industrialism, and the result is the workmen's compensation act.

The purpose of the act is wise and beneficient. It is by no means perfect; indeed it must be admitted that it is, if not tentative, at least crude, immature, inharmonious and disjointed, evidently the result of a compromise between clashing interests. The act and related acts were copied largely from the English workmen's compensation act of 1897 and subsequent acts for the regulation of factories and workshops, as well as acts amendatory thereto, the Ohio act evidently seeking to class certain occupational or industrial diseases as accidents, as, for instance, the act of May 6, 1913 (103 O. L., 819), with reference to the "general duties of employers" with respect to the prevention of certain occupational or industrial diseases.

The workmen's compensation and related acts introduced an entirely new principle, as servants, operatives and workmen are by their provisions given the right to compensation for injuries received in the course of their employment, absolutely irrespective of negligence or contributory negligence. In effect the law,

except in cases where the injury is the result of a wilful act or failure to comply with lawful requirements for the safety of employees, abolishes the right of the employee to bring an action for damages against his employer for injuries sustained in the course of his employment, and substitutes for that right certain definite compensation from the state insurance fund, or from the employer if he elects to directly pay his employees, or from non-contributors to the fund. The amount is called compensation, not damages; and as essential to the receiving of this compensation, it is not necessary that the injury be the result of negligence in any sense. If the injury is not self-inflicted, and is received in the course of employment, compensation must be awarded, either by the industrial commission, or suits may be brought for damages in the excepted cases.

This is wholly and absolutely a new right not known to the law of this state before the passage of these acts. All injuries received by workmen in the course of their employment, not purposely self-inflicted, are in effect regarded as accidents or occurrences not due either to design or negligence as defined by the law of torts.

In the struggle for existence, the greater part of mankind, of a necessity older than civilization, must labor for maintenance, for the support of themselves and their families, even for the superfluous requirements of others. As civilization advanced, however, protection and better conditions for workmen challenged the attention of humanitarians and legislators.

The compensation provided for by the acts under consideration is in no sense a charity; it is a right based upon natural justice. Employees and employers, in the field of industrialism, are engaged in a fierce struggle with competitive forces which act and react upon each other. In this struggle many are maimed and killed, and a wise, enlightened public policy demands that the wounded and the dependents of the killed shall be compensated. In work-shops and factories, even with the most improved protective devices and precautions, accidents are inevitable; workmen are always under orders, either peremptory, express or implied; and without obedience to orders production would cease

and industrial chaos reign supreme. If every workman in a factory should stop to ponder and deliberate the consequences of every movement he makes in obedience to orders, express or implied, his efficiency as a factor in production would be of no practical value. The court evidently had this view in mind in the case of *Van Duzen Gasoline Engine Co.* v. *Schelies,* 61 O. S., 310, when it said:

· "There is much reason in the rule that allows a favorable construction to be placed on the act of the servant done in obedience to the order of his superior, though involving danger. Obedience to orders given by a master becomes a habit with the servant. He obeys without much questioning the prudence of the order. It is expected that he will do so, and without such obedience the business of the master could not be successfully conducted."

The natural instinct of normal men in their sober senses to avoid injury and protect or preserve life and limb must be taken as a guaranty that they will use all the care to that end that the situation and circumstances under which they labor will permit (Section 136, Buswell on Personal Injury); hence it is no more than just that workmen, if injured in the course of their employment, or their dependents if killed, should be compensated under any and all circumstances where the injury is not purposely self-inflicted. The employer has no just ground to complain, for in the final analysis the consumer and not the producer bears the burden. All taxes, all rents, al costs of production and distribution, by a system or process of percussion and repercussion, are finally paid and borne by the consumer.

*Peet* v. *Mills,* Supreme Court of Washington, 136 Pac., 686, was a case involving the construction of a workmen's compensation act somewhat similar to that now under consideration. In passing upon the purposes of and the reasons for the act, the court say: .

"To say with appellant that the intent of the act is limited to the abolishment of negligence as a ground of action against an employer only, is. to overlook and read out of the act and its declaration of principles the economic thought sought to be

crystalized into law, that the industry itself was the primal cause of the injury and, as such, should be made to bear its burdens. The employer and employee as distinctive producing causes are lost sight of in the greater vision, that the industry itself is the great producing cause, and that the cost of an injury suffered in any industry is just as much a part of the cost of production as the tools, machinery, or material that enters into that production.''

There is much wisdom in this dictum; and if employers of labor could only be made to understand the truth and force of the reasoning, there would be less friction between labor and capital and less objection to compensation acts. Employers ought to understand that any injury to a distinct part of society is an injury to the whole, including those whose capital is invested in industrial pursuits. That the consumer eventually pays all the cost of production, including compensation to workmen, is everywhere recognized as an inevitable law of political economy. The premiums paid into the state insurance fund are simply a species of tax upon the industry, which the consumer pays when he buys the products of industry. Commerce carried in ships is insured against the risks and dangers of ocean transportation. The consumer pays this insurance. The consumer pays the insurance paid by merchants, as well as the cost of advertising, the interest on capital invested, and the rents paid, as well as all expense of distribution. The risks and dangers of industrialism are always great and always will be, and common humanity demands that the victims of these risks and dangers shall be compensated.

The act of June 15, 1911, was the result of the report of a commission appointed by the governor of the state by virtue of an act passed May 10, 1910 (101 O. L., 231). This commission was appointed to inquire into industrial conditions in this and other countries. The conclusions reached by the commission in its report were, substantially, that the methods or system of dealing with industrial accidents are unsound and wholly inadequate; that the system as a whole was productive of enormous waste; that actions at law for personal injuries, while annoying

and harassing to employers and employees, furnish no practical remedy for the injured, and that there existed widespread public sentiment that the general welfare demanded a radical change in the direction of improved conditions.

The act of June 15, 1911, was declared constitutional in *State, ex rel* v. *Creamer,* 85 O. S., 349.   While the mandatory act of March 14, 1913, is much broader in scope, the underlying principle is the same in both acts; so that it may be said that the act except, perhaps, Sections 22 and 27 and related acts now under consideration do not contravene any provision of the Constitution of the state, and this is especially true in view of the amendments to the Constitution of September, 1912, which will be referred to hereafter.

The right to pass the act of June 15, 1911, was held, in *State, ex rel,* v. *Creamer, supra,* to be a proper exercise of the police power of the state, which embraces all things necessary to secure and conserve the peace, safety, health, morals and best interests of the state and its people.

The right of the Legislature to abolish common law defenses to an action for damages for the negligence of an employer has been sustained by the courts of last resort in several states, as well as by the Supreme Court of the United States.

In the case of *Mondou* v. *Railroad Company,* 233 U. S., 1, in answer to the contenton that such right did not exist, the court said:

"A person has no property, no vested interest in any rule of the common law; and while property rights which have been created by common law can not be disturbed without due process, the law itself, as a rule of conduct, may be changed at the will  *  *  *  of the Legislature, unless prevented by constitutional limitations."

This decision was rendered under a federal liability act passed in the interests of workmen, and abolished certain common law defenses.   But if there is any possible doubt about the matter, it is removed by the constitutional provision found in Article II, Section 35, of the Constitution as amended in September, 1912, which reads:

"Section 35. For the purpose of providing compensation to workmen and their dependents, for death, injuries or occupational diseases, occasioned in the course of such workmen's employment, laws may be passed establishing a state fund to be created by compulsory contribution thereto by employers, and administered by the state determining the terms and conditions upon which payment shall be made therefrom, and taking away any and all rights of action or defenses from employees and employers, but no right of action shall be taken from any employee when the injury, disease or death arises from a failure of the employer to comply with any lawful requirement for the protection of the lives, health and safety of employees."

It will be seen by this amendment plenary power is conferred upon the Legislature, not only to create the fund, but to compel all employers of workmen to contribute thereto, as well as to take from employees all right of action against employers, and from employers all right of defense to such actions. The right and the remedy that existed before the act of June 15, 1911, and such right and remedy as existed after this act and prior to March 14, 1913, for injuries received in the course of employment, is taken from workmen, and in lieu thereof is substituted a new right and a new remedy, with the reservation that no right of action shall be taken from the workman or employee "when the injury, disease or death arises from a failure of the employer to comply with any lawful requirement for the protection of the lives, health and safety of employees."

In the act of June 15, 1911, the reservation or exception, as provided by Section 21-22, was that actions might be instituted in the courts in case the injury arose "from wilful act of such employer or any such employer's officers or agents or from the failure of such employer or any of such employer's officers or agents to comply with any municipal ordinance or lawful order of any duly authorized officer, or any statute for the protection of the life or safety of employees." For these words, aside from the phrase "wilful act," the single and simple phrase "lawful requirement" is substituted, in accordance with the constitutional provision in the act of March 14, 1913. The purpose of this change will be discussed later.

It will be noticed that the words "wilful act," which appear in the exceptions or reservations in the act of June 15, 1911, also appear in Section 29 of the act of March 14, 1913.

In *McWeeny* v. *Standard Boiler Company,* decided January 15, 1914, —— Fed., ——, Judge Day, of the federal court, rightly and properly held that these words were not limited in their meaning "to an act done intentionally with the purpose to inflict injury, but include acts which are not mere negligence, but which evince an utter disregard of consequences so as to inflict injury." This definition or construction seemed to the Legislature to enlarge the reservation contained in the constitutional provision; and in the act of the Legislature, and at the special session of the Legislature which convened January 19, 1914, it was enacted that "the term 'wilful act' as employed in this section (29) shall be construed to mean an act done knowingly and purposely with the direct object of injuring another'" (104 O. L., 193). Hence a "wilful act" is in fact by legislative enactment defined to be a criminal act, for if a man does an act knowingly, with the direct object and purpose of injuring another, and in fact does so injure another, the act would be nothing less than assault and battery; and if death resulted from such injury, it would be at least manslaughter, and might perhaps be murder. The probability that an employer would knowingly, purposely and wilfully injure, assault, or set a trap to injure one of his employees is so remote that the object of retaining these words in the act is difficult of comprehension, unless it can be said that if an employee should be so injured, his right of action must be preserved, lest it be lost for the reason that the injury was sustained in the course of employment, a contention which is extremely doubtful any court would entertain. This is one of the inconsistencies of the act. At all events it would be useless to plead "wilful act" as an exception under Section 29, unless the wilful act is in fact a criminal act.

In this connection it may be quite pertinent to ask why the Legislature did not fully exercise the power conferred upon it by Section 35, Article II of the Constitution, and establish a state insurance fund "by compulsory contribution thereto by

employers,'' that is, by requiring all employers to be contributors to the fund.

The elective provision of Section 22, by virtue of which certain employers may elect to directly pay compensation to their employees, or become what may be termed direct compensators, is an anomalous inherent weakness, and the act will not be perfect until it is eliminated. The act gives the direct compensator all the benefits of the reduced compensation, for no one will contend that full compensation is provided for, and it leaves the employee in the disagreeable position of claiming compensation from his employer or of losing his situation if he applies to the commission to have an award made which will become a liquidated claim for damages against the employer; and besides, the direct compensator may, under Section 54, contract for indemnity insurance if the contract provides for the payment of the compensation, nursing, medical and hospital services and medicines provided for by the act. This leaves the door open to all the evils of employers liability insurance, of which workmen have heretofore justly complained. This elective provision is a monstrous excrescence and must be cut out, and contribution to the state insurance fund by all employers be made compulsory, or the act will fail of its purpose and crumble of inherent weakness, inefficiency and want of uniformity and inadequacy of remedy to the injured and the dependents of killed employees.

The cases now before the court do not require us to hold that Sections 22 and 27 are unconstitutional, but we are clearly of the opinion these sections are repugnant to the organic law of the state.

In *State, ex rel,* v. *Creamer, supra,* it was held the act of June 15, 1911, found its validity in the police power of the state, a power Prof. Freund says has never been circumscribed, but continues to be elastic, as it reveals a ''power not as a fixed quantity, but as the expression of social, economic and political conditions.'' The police power, however, is not invoked by the Legislature except in instances where the Constitution is silent as to its exercise. The Constitution as amended September, 1912, expressly grants power to the Legislature to pass compensation

acts or laws; and the organic law having taken cognizance of the subject, we believe the Legislature can only act in strict accordance with the power granted, and in the manner specified, and that is to establish "a state fund to be created by compulsory contribution thereto by employers, and administered by the state."

This surely means compulsory contribution to the state fund by all employers amenable to the provisions of the act.

It may be claimed that because Section 22 provides for election by employers, this section is not repugnant to Section 35, Article II. But if this contention is sound, which is more than doubtful, still it must be insisted that Section 27 takes property without due process of law, and that Section 22 creates classes of employers.

The act of June 15, 1911, only deprives non-contributors of certain common law defenses, but, as has been seen, "a person has no property, no vested interest, in any rule of the common law." Section 27 of the act under consideration does deprive certain employers of the right of "due course of law" which "implies and requires that the parties litigant shall each have a day in court." (*Railroad Co.* v. *Sullivan*, 32 O: S., 152.) And by "court" is here meant, of course, a constitutional court, where trial by jury may be had if questions of fact are in issue. The industrial commission, by virtue of Section 22, may require such security or bond from direct compensators as it may deem adequate and sufficient to secure compliance with the provisions of the act: If a man employing from five to thirty men is unable to furnish the bond required, he must pay the premiums provided by the act, although he may never have an injury or accident in his factory or shop. Like the holder of an accident policy who is never injured, he pays for those who are injured. This is manifestly inequitable and unjust, and does make "an unjust and arbitrary classification and does not affect all who are within the reason" and scope of the act alike.

As was said by *Locke on Civil Government*, Section 142, a constitution is the bounds set to the legislative power of every commonwealth "to govern by promulgated established laws, not

to be varied in particular cases, but to have one rule for rich and poor, for the favorite at court and the countryman at the plow.'' A statute is not constitutional which ''would select individuals from a class or locality and subject them to peculiar rules or impose on them special obligations or burdens from which others in the same locality or class are exempt.'' *Cooley on Constitutional Limitations*, 537.

The same authority, page 563, says:

''The state should have no favors to bestow. Special privileges are obnoxious, and discriminations against persons or classes still more so.''

We have no hesitancy in saying that Sections 22 and 27 of this act are repugnant to Section 5, Article I; Section 26, Article II, and Section 35 of Article II of the Constitution of Ohio, and the Fourteenth Amendment to the Federal Constitution. These sections were evidently inserted in the act to placate a few large employers who are able to organize and maintain special accident or claim departments, and who foolishly and selfishly believe that indemnity insurance is a panacea for the evils of careless and negligent operation of industrial enterprises, as well as for the unskilfulness and negligence of laborers who are largely recruited from the agricultural districts of Southern Europe, and who too frequently become the victims of their own ignorance and failure to understand orders given to them by their superiors. These employers lose sight of the larger view, that as God notes the fall of a sparrow, so too society should note the slightest injury to any of the intigers of which the whole is composed.

It would seem also that in view of the fact that there is no appeal from an award made by the commissioners to an employee of a direct compensator, such employee is also deprived of his day in court and deprived of a jury trial, and that the sections for that reason are also repugnant to the Constitution of the state.

It was held in *State, ex rel*, v. *Creamer, supra*, that the act of June 15, 1911, created no new right, Johnson, J. saying, page 408:

"It creates no new right or new remedy for wrong done.  It is an effort to in some degree answer the requirements of conditions which have come in an age of invention and momentous change."

This opinion was rendered February 6, 1912.  The amendment to the Constitution above referred to went into effect January 1, 1913.  The act of March 14, 1913, and related acts do create a new right and give a new remedy to the employee.  But while these acts in effect practically take from the employee the right to sue his employer for damages, they in no way nor in any manner nor in any sense take away the right to sue and recover damages from a person other than his employer who may have negligently inflicted injury upon him while in the course of his employment.

While the act and related acts are far from being perfect, and contain many weak and inefficient provisions, and lack many provisions necessary to practical and efficient enforcement, they certainly do not deprive the employee of a right of action against a third person who injures him while he may be or is in the course of his employment.  Hence, if the driver of a lumber wagon, in the course of his master's business, is negligently injured by a railroad company while crossing its tracks upon a public highway, he may recover from the wrong-doer, notwithstanding he has recovered compensation or has been awarded compensation by the state industrial commisson from the state insurance fund, for the injury.

There is no possible justification in law or ethics or morals for the principle or proposition that a railroad company, or any other corporation or person, may wantonly or negligently injure a man and claim immunity on the ground that the injured man received compensation from the state insurance fund.  The act or law does not provide for full compensation; and even if it did, to hold that a third person might negligently injure a man while that man was in the course of his master's business, and escape liability merely because the man's employer was a contributor to the state insurance fund, would inevitably lead to wanton destruction of limb and life.  To so hold would be

tantamount to holding that because a man has ample insurance upon his life, another may negligently kill him; or if he has an accident policy, another may wantonly injure him, and plead the payment of the insurance as a defense to an action for the injury or death. It has been so uniformly held that this can not be done that it would be useless and unnecessary to cite authorities in support of the proposition. The English act of 1906 provides in express terms that an employee injured in the course of his employment, by a third person, ''shall not be entitled to recover both damage and compensation.'' The Ohio statute places no such limitation upon the rights of an employee. Besides, it must be remembered that in many respects the compensation provided for by the act under consideration is in the nature of a wage pension. Section 32 provides that in case of temporary disability, the employee shall receive sixty-six and two-thirds per cent. of his average weekly wage so long as the disability is total, not to exceed twelve dollars a week. Section 33 is in some respects similar, except that it provides specifically the amounts to be paid for certain specified injuries, as weekly wages during specified periods. Sections 34, 35, 36 and 38 relate to continuance of payments of compensation or wages, to whom paid in case death results, and other matters of detail. In some instances the payments continue until the death of the injured employee. In other instances the time during which payments shall continue is definitely fixed; but by Section 39 it is provided, ''The powers and jurisdiction of the board over each case shall be continuing, and it may from time to time make such modification or change with respect to former findings and orders with respect thereto as in its opinion may be justified.''

From a consideration of these provisions it becomes apparent at a glance that the doctrine forbidding double compensation or double recovery for the same wrong can have no application, and may not be invoked by a third person who has negligently caused an injury to an employee while engaged in his master's business, even though such employee has made application for and has been awarded compensation by the industrial commission. Suppose, for instance, the commission should find the injury

resulted in permanent total disability, "the award (Section 34) shall be sixty-six and two-thirds per cent. of the average weekly wages, and shall continue until the death of such person;" but who can tell how long such person may live? Or suppose the disability is only partial, and the award is made to continue for sixty or seventy-five weeks, the total amount of the award can not be determined; for under Section 39 the commission "may from time to time make such modification or change with respect" to it "as in its opinion may be justified." If the disability is temporary, an award may be made, under Section 32, to continue for six years; but in case the temporary disability disappears, the award may be changed at any time, or it may be reduced or modified. Then again, under Section 35, if death results in two years, the benefits, amounts thereof not to exceed $3,750, and to whom distributed, are provided for; but though the amount may be fixed under this section or Section 32, no one knows whether the man will die within two years, or whether the temporary disability provided for in Section 32 may not at any time cease and the award be modified by the commission.

Again, it must not be forgotten that an employee is entitled to the compensation provided for in the act, even though the injury be the result of his own gross negligence, and that the employer was in no sense responsible for it, and was in no sense a wrong-doer. Under such circumstances, how can it be said the employer is a tort feasor?

We think it as a fair construction of this act to hold that it was the intention of the Legislature to make all payments provided for compensation in lieu of wages. Indeed the sections just referred to seem to clearly indicate this intention, if they do not expressly provide that the compensation payments are received by the employee or his dependents precisely in the same manner and in the same sense as wages are ordinarily paid. If there is any doubt as to this view, we think it disappears in view of Section 41, which reads:

"Compensation before payment shall be exempt from all claims or creditors and from any attachment or execution, and shall be paid only to such employees or their dependents."

The industrial commission has held, and properly so, that these statutory compensations are not to be reduced by reason of a judgment against or settlement with a third person who may have been a tort feasor.  See Department Reports, February 11, 1915, page 836, in which it is held that:

"Where an employee is injured while in the course of his employment, and a tort feasor other than his employer is responsible therefor, his right to receive compensation in accordance with the workmen's compensation act of Ohio is not lost by settlement with the tort feasor."

New Jersey has a workmen's compensation act similar to the Ohio act.  In *Painting Company* v. *Klotz*, 85 N. J. L., 432, it is said in the syllabus:

"Where a workman is injured by an accident arising out of and in the course of his employment, and a tort feasor other than his master is responsible therefor, the right to compensation under the act of 1911 is not lost by settlement with and release of a tort feasor."

On page 434 of the opinion the court say, after stating the general policy and reason for the act:

"These considerations suffice to show that the right to compensation under the statute, and the right to recover damages of a tort feasor, are of so different a character that the rule of law appealed to by a prosecutor is inapplicable."

That there must be full and complete satisfaction for a wrong or an injury before all persons who are liable or responsible therefor are released or discharged from liability, without the consent of the injured, is so well established that authorities need not be cited in support of the proposition.  In view of the fact that the compensation awarded under the act is admittedly not full or complete, and that its amount can not be definitely fixed, or, if so fixed, is in many instances subject to change or modification, the application of the doctrine of double recovery, as has been said, is, under all the circumstances, impossible and need receive no further attention.

There can be no doubt as to the soundness of the decision of the industrial commission just cited, and of course the converse of the proposition must be equally sound—that the tort feasor, or third person, can not be permitted, even in mitigation of damages, in a suit brought against him, to plead the fact that the injured person, or his dependents in case of his death, received compensation from the state insurance fund. In many of the states where workmen's compensation acts are in force the right of subrogation against the tort feasor is expressly preserved to the employer or the state; but in the Ohio act no such provision is made; and in the absence of such statutory provision the right of subrogation must be denied. But it does not follow that because this right is denied, the right to recover from a tort feasor renders the right to the compensation provided for obnoxious to the doctrine of double compensation or double recovery for the same wrong, and for the reasons already pointed out. Nor can the principle be affected by the fact that the tort feasor is also a contributing employer to the fund.

In the case of *Vayto* v. *The River Terminal Railway Co.*, No. 140041, the River Furnace Company, for which the plaintiff was working, owned certain ladle cars, which the plaintiff was engaged in cleaning. The defendant railway company owned the tracks and engine, and the plaintiff claims he was injured while passing from one track to another, through the negligence of the defendant railway company. Counsel for the defendant company claim it was engaged with the plaintiff in a common service for the River Furnace & Dock Company. Admitting this to be true, it furnishes no reason why the railway company should escape liability for its act if it negligently injured the plaintiff. He was certainly in the line of duty or line of employment for the River Furnace Company, and was entitled to compensation from the fund; and to hold that the railway company might negligently injure him, and escape liability simply because his employer was a contributor to the state insurance fund, would be a monstrous proposition which, if allowed, would practically amount to a license to negligently injure and kill employees whose employers are contributors to this fund. Take

the case of a street railway, for instance, which is erecting a car barn. It has a contract with a man to put a roof upon the barn through which its tracks run. Its own employees are working on these tracks. One of the contractor's employees negligently drops a hammer, which injures or kills the employee of the railway company. Both servants are engaged in a common service for the railway company; but it can not be held that the tort feasor is not responsible for the wrong done the employee of the railway company, simply because the railway company is a contributor to the state insurance fund. Such a holding would practically nullify the provisions of the act. That the right of subrogation does not exist is a matter for the Legislature, and not for the courts.

In the consideration of some of the issues now before the court, it becomes important to define what is meant by the phrase "in the course of employment," as used in Section 21 of the act.

The industrial commission has held that a man going from his place of employment to his home after his work for the day has ended was not in the course of his employment; and in another case, that a servant who was injured while fooling with his fellow-workmen during the noon hour was not in the course of his employment. But a servant who was bitten by a dog while engaged in the work he was employed to perform, was held by the commission to be in the course of his employment. And in another case it was held that an employee who was injured while going from the place where he was at work to the office to receive his pay was in the course of his employment. And again, an employee whose duty was in part to drive a delivery wagon, but who on Saturday was required to take the horse to the country to pasture and return on Monday, and he was injured while preparing to return to the city, was held to be in the course of his employment. See 12 O. L. R., 545-551.

In *Terlecki* v. *Strauss*, 85 N. J. L., 454, an employee who quit work at a machine shortly before noon, and was, according to custom, combing particles of wool from her hair, preparatory to going home, some distance from her machine, when she was injured by her hair being caught in other machinery, it was held

the accident arose out of and in the course of her employment. This is undoubtedly upon the theory that combing wool out of her hair was an incident to the business. The court said:

"The employment was not indeed the proximate cause of the accident, but it was a cause in the sense that but for the employment the accident would not have happened."

Again, a collier was injured while leaving his work and crossing lines of rails controlled by his employer. He might have taken a different route and avoided the rails or tracks, but the route he took was the shortest and was commonly and ordinarily used by the workmen, with the knowledge and consent of the employer. It was held the accident arose out of and in the course of the employment. *Dare* v. *Colliery Company*, 2 K. B., 539 (1909).

Other instances might be cited indicating that under the compensation acts "course of employment" is not so restricted as under the general doctrine relating to scope of employment. The general rule relating to course of employment under compensation acts may be thus defined: If the servant at the time of the injury was doing something he was authorized to do, or which may be fairly inferred or implied from the nature of his employment and the duties incident to it, he may be said to have been in the course of employment. Or it may be stated somewhat differently—was the servant at the time doing an act in furtherance of the master's business? It may also be said, in determining, under these acts, whether an employee is in the course of employment, that the law will undoubtedly not make any fine distinctions fixing just what is meant by "the course of employment;" and where there is doubt it will be resolved against the defendant, upon the ground that the defendant put the servant in motion and he would not have been injured but for the employment.

So far as the English decisions under the workmen's compensation act have gone, they seem to indicate that if what the workman is doing at the time of the injury is no act of service, but simply for his own pleasure, or if he is improperly meddling

with that which is no part of his work, it is held that the accident or injury does not arise out of and in the course of his employment; but if, while engaged in the master's work, he acts upon an emergency, and does anything in his master's interest, even though the thing he does is not part of the work he was employed to do, still the accident or injury is said to arise out of and in the course of his employment.

This also seems to be the doctrine of the decisions in this country. It is not whether the servant is acting under instructions from the master, or under orders, but whether the act may fairly be said to have such connection with the business as may be incident to it or be fairly implied from its nature.

The purpose of the Ohio act and subsequent acts related to it is to compensate in a measure every operative, workman or employee for every injury, not purposely inflicted, received or sustained in the course of his employment, whether working for or rendering service to a person, firm, private or public service corporation, or to the state or political subdivision thereof, under any appointment or contract for hire, express or implied, except public officials, policemen and firemen in cities where pension funds are now or may hereafter be established. In the event death results from an injury, the dependents of the killed workman receive the compensation. The state, counties, school districts and municipal corporations must contribute to the fund. Employers of labor may or may not; and under certain conditions an employer may elect to pay directly to his employees the amount that would be paid by the industrial commission if the employer elected to pay the premiums fixed by the commission.

A brief analysis of some of the provisions of the act may help us to better understand it.

The law as first enacted created a state liability board of awards. The duties and functions of this board are now performed by the industrial commission, under the act of March 18, 1913 (103 O. L., 95). Plenary powers are given to the commission within the provisions of the act and related acts. Every employer of the state employing five or more employees regu-

larly in the business in which he is engaged shall, in the month of January of each year, furnish the commission certain information on blanks furnished by the commission. This information is secret and for the exclusive use of the commission, which is empowered to classify occupations with respect to their degree of hazard, and fix rates of premiums sufficiently large to provide an adequate fund for the compensation provided for by the acts; also to adopt rules and regulations as to the collection of these premiums. The treasurer of the state is made the custodian of the fund. The surplus may be invested in federal, state or municipal bonds; and provision is made how the surplus may be created. The state, every municipal and *quasi*-municipal corporation, every school district, every person, firm and private and public service corporation having regularly in its service five or more workmen, are employers and subject to the provisions of the act. Every employer shall pay to the fund the amount provided in the act or fixed by the commission, which is given full and ample power to compel the payment. The fund consists of the premiums paid by employers, as fixed by the commission, and one per centum of the amount of money expended by the state, counties, municipal corporations and school districts each year for the service of the persons named in the act. The employees of direct compensators and employees of persons, firms or corporations which are not contributors to the fund can not participate in this fund or receive compensation from it. While their right to compensation for all injuries not purposely self-inflicted is the same, they must receive this compensation, if at all, from the direct compensator and the non-contributing employers.

In seeking to realize results on this phase of the act, its crudity, incompleteness and want of unity become strikingly apparent.

Section 22 provides that any person, firm, private or public service corporation employing five or more workmen regularly, and of sufficient financial ability, may, under certain prescribed conditions, become a direct compensator and elect to directly compensate their injured and the dependents of their killed em-

ployees, in which event they are not required to pay the prescribed premium, except such amount as may be reqiured to be credited to the surplus fund created by the act. The direct compensator, however, is required to pay an amount "which shall in no event be less that that paid or furnished out of the state insurance fund, in similar cases, to injured employees or to the dependents of killed employees, whose employers contribute to said fund." But they are not liable to respond in damages at common law or by statute, except the injury arises as is provided in Section 29, that is, from the wilful act of the direct compensator, his officers or agents, or from failure of the direct compensator, his officers or agents, to comply with any lawful requirement for the protection of the lives and safety of its employees, in which event the employee (or, in case death results, his representative) may, at his option, either claim compensation under the act, or institute legal proceedings for damages; to which action, however, the defenses of contributory negligence and the fellow-servant rule may be invoked. If the direct compensator fails or refuses to pay the compensation, and render services, such as surgical care and medical attendance and hospital accommodations provided for by the act, the injured employee (or his representative in case death results from the injury) may file his application with the commission for compensation, and the commission shall hear and determine the same and fix the compensation in like manner as in other claims before the commission; and unless the amount so determined is paid by the direct compensator within ten days after receiving notice thereof, it becomes a liquidated claim for damages, with an added penalty for fifty per centum, and may be recovered in an action in the name of the state for the benefit of the persons entitled to receive it.

This elective provision, in Section 22 of the act, is open to serious objection, as will be presently seen.

Section 29 gives the employees of contributing employers the same right to institute legal proceedings under the same conditions, that is, for wilful act or failure to comply with any lawful requirement for the protection of the life and safety of the em-

ployee. An employer employing less than five workmen regularly may avail himself of the provisions of the act, and an employee who remains in the service with notice that he has done so must, in case of any injury, recover compensation, if at all, under the provisions of the act.

By paragraph 2 of Section 13, it is provided that every person, firm, private or public service corporation that has in its service five or more workmen regularly in the same business, is an employer within the sense and meaning of the act. But by Section 24 a person or corporation employing less than five workmen regularly is also called an employer. This is another of the inconsistencies of the act.

By the first clause of Section 25 it is provided, that the commission "shall disburse the said insurance fund to such employees of employers as have paid into said fund the premiums applicable to the class to which they belong, who have been injured in the course of their employment, wheresoever such injuries have occurred, and which have not been purposely self-inflicted, or to their dependents in case death has ensued."

It will be seen by this section that the commission can disburse the fund only to the employees of employers who have paid into the said fund the premiums applicable to the class to which they belong.

Firms, persons, private or public service corporations who fail to take advantage of the provisions of the act are not entitled to the benefits of the act; and in actions against them for damages for injury or death from injury, the defenses of the fellow-servant rule, assumption of risk and contributory negligence are not available to them. Nor is it necessary, in an action against a non-contributor, to allege or prove that the act which caused the injury was a wilful act, or that it resulted from a failure to comply with any lawful requirement made for the protection of the lives or safety of employees. All the rights which an employee had before the passage of the act remain to him with respect to non-contributing employers, together with the added remedy that the defenses just named are not available to the employer.

This is a sort of coercive inducement to all employers to avail themselves of the provisions of the act. But by Section 27 it is provided that an employee whose employer has failed to pay the premiums provided by the act may elect either to file his application with the board for compensation, or institute legal proceedings against his employer. If he files an application with the commission, the amount of compensation fixed by the commission becomes, after ten days' notice, a liquidated claim for damages, which, with an added penalty of fifty per centum, may be recovered in the name of the state against the employer for the benefit of the persons entitled to it.

This provision in effect makes the act mandatory either to be a contributing employer or a direct compensator.

By Section 29 it is provided that an employee, or his legal representative in case death results, who makes or files application for an award, or accepts compensation from a direct compensator, waives his right to exercise his legal option to institute legal proceedings, except that in certain contingencies the right of appeal from the action of the commission to the court of common pleas is reserved. This provision of the act should be constantly borne in mind.

So much of Section 43, relating to appeals, as is applicable, reads as follows:

"Section 43. The board (commission) shall have full power and authority to hear and determine all questions within its jurisdiction, and its decision thereon shall be final. Provided, however, in case the final action of such board (commission) denies the right of the claimant to participate at all in such fund on the ground that the injury was self-inflicted or on the ground that the accident did not arise in the course of employment, or upon any other ground going to the basis of the claimant's right, then the claimant, within thirty days after the notice of the final action of such board (commission) may, by filing his appeal in the common pleas court of the county wherein the injury was inflicted, be entitled to a trial in the ordinary way, and be entitled to a jury if he demands it."

It will be seen here that the word "appeal" is really a misnomer; that is, the right given is not an appeal in the ordinary

sense, for it is provided that he shall be entitled to a trial in the court of common pleas in the ordinary way, and be entitled to a jury if he desires it.

It may also be noticed that this is the only section in the act where the word "accident" occurs.

It will be seen at a glance that this section giving the right of appeal limits the right to cases in which "the final action of such board (commission) denies the right of the claimant to participate at all in such fund." The only persons who have a right to participate in the fund are the employees of employers who contribute to the fund, and the employees of the state, municipal, *quasi*-municipal corporations, and school districts.

In the case of *Schmidt* v. *The Industrial Commission,* now before the court, it is admitted that the plaintiff, when injured, was employed by a direct compensator; that he was injured on September 4th, 1914, and made or filed an application for compensation with the industrial commission, which on March 31st, 1915, made an award allowing compensation for disability to December 18th, 1914, the commission holding that disability subsequent to that date was not caused by the injuries received September 4th, 1914. From this award an appeal was filed in this court April 4th, 1915, and petition filed, to which a demurrer has been interposed.

Counsel for plaintiff contend that the word "fund" as used in the act should be so construed "as to cover not only the money which the commission orders paid from the state treasury to the injured party, but also money which the said commission orders paid by the employer to the injured party."

In *Peet* v. *Mills,* 138 Pac., 638, *supra,* the Supreme Court of the state of Washington had under consideration a question arising under the workmen's compensation act of that state. In the syllabus it is said:

"Remedial statutes should be liberally construed to cure the evils sought to be remedied, and advance the remedy even by including therein cases without the letter, but within the reason of the statute."

It was formerly thought, and so expressed in a maxim, that it was the part of a good judge to enlarge his jurisdiction; and

in construing the statute under consideration there are many reasons why such a course should be pursued, unless it should contravene the plain letter of the law.  It should be remembered that courts belong to the judicial, and not to the legislative department of government.  The rule as we understand it is, that where the language of a statute is clear, there is no reason for construction, and the spirit of a provision, be it statutory or constitutional, must be extracted from its words and not from conjecture.  The courts should not extend their powers by farfetched implication, any more than they should defeat the purpose of a statute by a narrow or unreasonable construction. *Cass* v. *Dillon,* 2 O. S., 607; *Wilcox* v. *Nolza,* 34 O. S., 520.

By Section 9 of the act it is provided that "the treasurer of state shall be the custodian of the state insurance fund." And it can not be said, even by implication, that moneys not in the hands of the state treasurer, and that never will be in his hands or under his control, are any part of that fund.

If a sinking fund is maintained by taxation, can it be said that taxes not yet levied or moneys not yet earned or collected are a part of that fund?  As here understood, a fund is a stock or accumulation of money immediately available for the purpose of being devoted to a specified end.

Nowhere in the act do its imperfections and want of uniformity more strikingly appear than in this connection.

By Section 27 it is provided that an employee of a direct compensator may, in case of injury, if the direct compensator fails to pay the compensation provided by the act, file his application with the commission for an award, which if allowed becomes a liquidated claim for damages to be collected by an action in the name of the state.  If he does, however, it must be remembered that he waives the right to institute legal proceedings, even if the injury be the result of a wilful act or failure to comply with lawful requirements made for the protection of employees. But if the employee files an application with the commission for an award, he can only do so where the direct compensator fails to pay.  There is no provision for an amicable adjustment of a dispute between the injured workman and his employer, or between dependents of the injured workman and his employer in

case of death, as to the amount of compensation. The only remedy the injured employee has in case of refusal or failure to pay, is to file his application with the commission; and, as has been said, this is tantamount to bringing a suit, and results in friction and the probability of discharge. The injured employee should not be placed in this position. All accidents and injuries should be reported immediately to the commission, and be promptly investigated by an agent of that body while the facts are obtainable and before they can be in any way colored or minimized by interested parties; and the commission itself should be empowered to require the direct compensator to comply with the provisions of the act within a specified time; and upon his failure to do so, the employee might then file his claim with the commission.

In Section 21 it is provided that every employee "shall be entitled to receive, either directly from his employer, as provided in Section 22 hereof, or from the state insurance fund," the compensation contemplated by the act. If the employee is to receive the compensation directly from the direct compensators, it is of course paid from money not in the fund and which the law does not contemplate should ever be in the fund.

Referring again to Section 27, it will be noticed that in case the direct compensator fails to pay, and the employee files an application with the commission, which hears and determines the issues involved, and if an award is made, suit may be brought on the award against the direct compensator in the name of the state, and judgment rendered against him or it for the amount as a liquidated claim for damages, together with an added penalty of fifty per cent.; and if judgment is rendered against the direct compensator, this judgment must be paid by the direct compensator, and is not paid from the state insurance fund. Hence it will be seen that the employee of such employer has no possible right to participate in the fund. The fund is not created or accumulated for him; he has no possible relation to it.

In *Hoogeboom* v. *Industrial Commission,* 24 C.C.(N.S.), ——, this question was, we think, squarely before the court, except that the employer who caused plaintiff's injury was a non-contributor to the fund, and not a direct compensator. The plaint-

iff filed his application with the commission under Section 27. The commission found the injury complained of was not sustained in the course of employment, and an appeal was taken, demurrer sustained by the court of common pleas, and error prosecuted to the court of appeals.  Meals, J., rendered the opinion and held, substantially, that the act embraced ''employers who do and who do not comply with the provisions of the act,'' and that ''Section 43 of the act relates to the class of employers who have complied with the provisions of the act and *contributed to the insurance fund created by the act.*''

It is true that direct compensators comply with the provisions of the act, but they do not pay the premium provided by the act. They are not contributors to the fund.

Section 23 provides that contributing and direct compensating employers ''shall not be liable to respond in damages at common law or by statute law, save as hereinafter provided, for injury or death of an employee.''

Proceeding now to the exception or reservation of the right of the employee to sue for damages, we find by Section 26 that any employer ''who shall fail to comply with the provisions of Section 22 hereof shall not be entitled to the benefit of this act during the period of such non-compliance,'' and shall be liable in actions at law for injuries negligently sustained by their employees, and to such actions the defenses of the fellow-servant rule, assumption of risk and contributory negligence shall not be available to the employer.  This section does not relate to the direct compensator, for to become such he must comply with the provisions of the act as provided for in Section 22.

By Section 29 the right to institute legal proceedings for damages is reserved to the employee against all classes of employers if the injury results from wilful act or failure to comply with any lawful requirement for the protection of the lives and safety of employees; but in such actions the employer may plead the defenses of the fellow-servant rule and contributory negligence. Whether the defense of the assumption of risk remains with the employer is at least doubtful.  Upon the assumption that statutes in derogation of common law rights must be strictly

construed, it would seem that the right remains, as it is not expressly denied. Upon the theory that a wilful act, or a failure to comply with any lawful requirement for the protection of employees, places the employer outside of the scope of the act and denies him the rights guaranteed by the act, it would appear he is to be treated under these circumstances as if the act never existed; and unless the defense of assumption of risk is denied by the Norris act or other related statutes, it remains.

The last clause of Section 29 provides that if an employee makes application for an award or accepts compensation from a direct compensator, he waives his right to institute legal proceedings in any court, except as provided in Section 43; or if he institutes legal proceedings, he waives his right to an award from the fund, or direct payment from the direct contributor.·

The plaintiff Schmidt, when he accepted compensation from his employer, then waived his right to institute legal proceedings of any kind in any court, unless this right is saved by Section 43. This section, as we have seen, denies the right of appeal in any case unless the final action of the commission denies the right of the claimant to participate at all in such fund; and not only that, but the right of appeal is still further limited and restricted to cases where the commission denies the right to participate at all in the fund, on the ground "that the injury was self-inflicted, or on the ground that the action did not arise in the course of employment, or upon any other ground going to the basis of the claimant's right."

It is important that we bear in mind the phrase "in the course of employment" in constructing Section 43 or passing upon a finding of fact made thereunder by the commission. If, for instance, an employee receive an injury by which tissue is cut or broken so as to cause a flow of blood, and a week or two thereafter septicemia or blood poisoning results, the commission may properly find septicemia did not arise in the course of employment, but it may have been caused by unskilful surgical treatment or the negligence of the injured man in failing to properly care for the cut or injury, or in carelessly exposing the injured parts to septic contact.

The statute makes the finding of the commission on the question of course of employment final, and it can not be disturbed. Even if the contention of counsel for Schmidt is sound, that the money paid by his employer directly to him is by implication to be treated as part of the fund, it will be seen he was not denied the right "to particapate at all in such fund," as he received and accepted compensation for fourteen weeks, or something over one hundred and fifty dollars. The precise amount we are unable to state, as it is not named in the petition. The claim is made, however, that Schmidt was denied the right to participate at all in the fund, for the reason that he was denied compensation for tuberculosis of the lungs, which it is claimed resulted from the injury. This raises the question of disease, which will be discussed later. All that is necessary to be said here is, that if Schmidt had tubercular trouble when injured, and the injury so aggravated the disease that death resulted, there might be much in the contention that the compensation allowed was wholly disproportionate to the consequences of the injury.

It was held in *Railroad Company* v. *Buck,* 96 Ind., 346, that "where injury is such as to render the system of the injured man liable to take on disease, and to so enfeeble the system as to make it less likely to resist the inroads of disease when it does set in, and death results, the death is, in legal contemplation, attributable to negligence. See also 61 Md., 74; 52 Wis., 150; 162 Ill., 448. But Schmidt did not die as the result of an injury aggravating an existing disease. The claim, however, is that the disease was brought on as a result of the injury.

The commission, by Section 43, is given full power to determine this question of fact; and as this decision is final, unless it denies a participation at all in the fund, under the limitations before mentioned, and as such denial was not interposed, we must conclude and hold its decision is final in determining that any present disability is due to causes other than an injury received in the course of employment. If, as a matter of fact, this man now has tuberculosis of the lungs, the commission may have found it existed prior to the injury, or is due to other causes, and the finding can not be disturbed.

Counsel for plaintiff cite *Police* v. *Industrial Commission*, 23 C.C.(N.S.), 433, in support of the doctrine contended for. In this case, Police made application for compensation for "double inguinal hernia." The commission found hernia existed, but that it did not result from injury received in the course of employment; however, seven dollars was awarded for aggravation of hernia. Grant, J., said, "The award was for a thing not asked for, and was in the nature of a voluntary act on the part of the commission," and therefore he was denied the right to participate at all in the fund for the injury of which he complained. The appeal was allowed, not only for the reason stated, but also because the award was so grossly disproportionate to the injury sustained as to amount to a denial of justice.

We are not prepared to say that the court may not allow an appeal if the compensation awarded is in fact a denial of justice. This, however, should so clearly appear as to leave no room for doubt. If, as a matter of fact, the industrial commission held that inguinal hernia, or hernia of any kind, is wholly due to some inherent weakness in the system, and is not due to strain, however suffered, which a man's employment requires him to exercise, we think the commission is wrong, and should give that subject further consideration. Causes of disease are predisposing and exciting. Even if there is an inherent weakness in a man's system, it can only be said to be a predisposing cause to a disease, and it may never develop unless there is interposition of an exciting cause; and if the predisposing cause or weakness is put in motion by a severe strain received in the course of employment, and an injury results, there is no reason for denying compensation.

In the Schmidt case the application was for compensation for an injury, and the compensation awarded was for disability due to the injury, and not for an aggravation of an existing disease. The finding was that the injury of September 4, 1914, arose in the course of employment. Compensation was awarded to December 18, 1914; and the commission held that the "disability subsequent to said date was not caused by said injury."

Under all the circumstances, the demurrer must be sustained. The case of *Jacob Smith* v. *The American Steel & Wire Com-*

*pany* is before the court on demurrer to the petition. Plaintiff claims he was injured September 21, 1914, while in the course of employment for the defendant, by reason of the fact, as he avers, that a steam drop-hammer at which he was working was "loose and unsteady on its frame and supports, and because the base (anvil) on which the steel was placed was irregular and uneven cn its surface and loose and wet from dripping water." The plaintiff was holding a piece of steel under the hammer on the anvil which, when struck by the hammer, because of the defects mentioned, was propelled with great force and violence against his leg and knee, causing the injuries of which he complains. It does not appear from the petition to which class of employers the defendant belongs, whether a non-contributor or a contributor to the fund, or direct compensator. This ought to be stated, as a different rule applies to two of these classes. If a non-contributor, the defendant can not avail itself or himself of the defense of the fellow-servant rule, assumption of risk, and contributory negligence. If the defendant is a contributor to the fund or a direct compensator, the action can only be maintained if the act causing the injury was wilful or if the injury arose from a failure to comply with some lawful requirement for the protection of the lives and safety of employees. If this is the ground upon which recovery is sought, the defenses of contributory negligence and the fellow servant rule are available to the defendant. But there is no lawful requirement for the protection of employees specifically relating to the conditions described in the petition. Nor is there any averment that the defendant or its officers failed to comply with any lawful requirement for the protection of the lives or safety of the employees. The basis of the action is, that certain appliances were in an unsafe and dangerous condition. There is an averment that the defendant failed to furnish the plaintiff a safe place in which to perform his work, and this raises an entirely different question.

Under the common law, an employer was bound to furnish a safe place or use ordinary care in that respect. By the act of March 18, 1913 (103 O. L., 95), furnishing a safe place by employers is made a statutory requirement. This is a supplemental

or related act to the compensation statute. It provides, among other things, that the duties of the state liability board of awards created by the compensation act, the duties of the commissioner of labor statistics, the chief inspector of mines, chief inspector of workshops and factories, and chief examiner of engineers, shall be performed by the industrial commission. It also provides that the commission shall have power to prescribe hours of labor, provide for safety devices and safeguards, and make and promulgate orders and general orders for the protection of the lives and safety and general welfare of employees; and these orders may become lawful requirements, under certain conditions, under the compensation act.

The policy of this act is to minimize accidents, protect the lives, limbs and health, and provide for the comfort, decency and moral well-being of all who labor for a living.

This act practically empowers the industrial commission to perform acts and duties similar to those performed by the Secretary of State for the Home department under the English compensation, factory and workshop acts. The similarity is in many respects striking, the commission, however, having greater powers as its orders and general orders are really legislative in character. An employer who is dissatisfied with an order may commence an action, under Section 38 of this latter act, in the Supreme Court, against the commission to vacate or amend an order on the ground that it is unreasonable or unlawful. Under the English act, when the inspector concludes premises are dangerous, he may apply to a court of summary jurisdiction for an order prohibiting the use of such premises until the danger has been removed. The Ohio statute seeks to accomplish the same result by giving an employee the right to bring an action in the Supreme Court to determine whether an order is unreasonable or unlawful. The Ohio statute is penal in character, and it does seem that acts criminal in nature ought to be clearly specified by legislative enactment.

Section 1027, General Code, provides in exact terms just what appliances, openings, shafts, stairways, cogwheels and machinery shall be guarded, and how guarded. It also provides how emery

wheels shall be operated.  Under the act of May 6, 1913 (103 O. L., 819), providing for the prevention of lead poisoning among other things, the acts that are to be done and the appliances provided for are specifically named.  This act provides in precise and exact terms how the manufacture of lead products shall be carried on.

Section 1300, General Code, specifically names the kind of machinery and occupations at which it shall be unlawful to permit a child under sixteen years of age to work; and as to exits, fire escapes, doors and floor space in workshops, they are in exact terms defined and provided for by Sections 1028-1 and 1028-2, General Code.

All these statutes are penal, as is the act of March 18, 1913 (103 O. L., 95).

If an employer should be arrested for violation of an order made by the commission in regard to premises, safety devices, or hours of labor, the constitutionality of the latter act, so far as it confers legislative power upon the commission, or the Supreme Court, may be seriously questioned.  The Supreme Court of this state has never gone so far as to say that an act done in violation of a statute or ordinance is negligence *per se,* or that it even raises a presumption of negligence.  *Hopple* v. *Parmlee,* 20 O. C. C., 303.  This case is affirmed in the 66 O. S., 614, without opinion.

If this is true, it is difficult to understand how an order of the commission may become such a lawful requirement as to enable an employee to take advantage of the exception or reservation contained in Section 29 of the compensation act.

In *Variety Iron Works Co.* v. *Poak,* 89 O. S., 297, it is held, however, that failure to comply with an absolute and positive duty imposed by statute on owners of shops and factories is negligence *per se.*  In the opinion, page 303, the court say:  "The Legislature in positive terms has defined the duty of the employer in this respect."

And the cases of *Meek* v. *Pennsylvania Co.,* 38 O. S., 632, and *Jacobs* v. *Fuller & Hutsenpiller Co.,* 67 O. S., 70, are not decisive of the question.  The distinction seems to be that a statute

or an ordinance is ordinarily declaratory of the common law in many cases, and is not designed to enlarge it. Violation is not negligence *per se* in such cases, but the statute or the ordinance may go to the jury as tending to show negligence. But the violation of a statute conferring a new right in derogation of common law, and absolute and positive in its terms, is negligence *per se*. There seems to be a clear distinction between a statute positively providing that a saw or a cogwheel shall be adequately guarded, and a statute forbidding an automobile to run at a greater speed than fifteen miles an hour; for if a man's clothing is caught in the cogs of a rapidly revolving wheel or the teeth of a rapidly revolving saw, there can be no question as to the cause of the injury; while the man driving an automobile may negligently injure another even while going at less than fifteen miles an hour, and a jury might find a speed of five miles an hour excessive under certain circumstances. The proposition may be concretely stated by saying that the violation of a penal statute does not in itself necessarily furnish ground for a civil action unless the violation of the statute is the proximate cause of the injury complained of; that is, if the act which causes the injury is made unlawful by statute, then the violation of the statute is negligence for which recovery may be had in a civil action. And if the violation is that of an act which imposes an absolute and positive duty, and the injury results proximately from and because of the violation, it is negligence *per se*. Or, to state it differently—the omission or commission of a duty is not the foundation for an action unless it results in injury to one for whose protection the duty is imposed. *Erie Railway Company* v. *McCormick*, 69 O. S.; 46.

*Cooley on Torts* (3d Ed.), 1399, perhaps states the law applicable under these circumstances.

"Where the statute imposes a new duty where none existed before, and gives a specific remedy for its violation, the presumption is that this remedy was meant to be exclusive, and the party complaining of a breach is confined to it. * * * So if the performance of a duty is enjoined under a penalty, the recovery of this penalty is, in general, the sole remedy, even where it is not payable to the party injured. But the rule is not without its

exceptions, for if a plain duty is imposed for the benefit of individuals, and the penalty is obviously inadequate to compel performance, the implication will be strong, if not conclusive, that the penalty was meant to be cumulative to such remedy as the common law gives when a duty owing to an individual is neglected.''

As was said by the court in *Jacobs* v. *Fuller, etc., Co.*, 67 O. S., 67, at 75:

''The reason for this rule is that the injured party has a right to assume that the other party will obey the law, and has the right to govern himself accordingly, that is, in cases where the act complained of and which caused the injury is the very act which is made unlawful by the statute.''

Sections 15 and 16 of the act of March 18, 1913 (103 O. L., 95), reads as follows:

''Section 15.    Every employer shall furnish employment which shall be safe for the employees therein, and shall furnish a place of employment which shall be safe for the employees therein, and for frequenters thereof, and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes, follow and obey orders and prescribe hours of labor reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety and welfare of such employees and frequenters.

''Section 16.    No employer shall require, permit or suffer any employee to go or be in any employment or place of employment which is not safe, and no such employer shall fail to furnish, provide and use safety devices and safeguards, or fail to obey and follow orders or to adopt and use methods and processes reasonably adequate to render such employment and place of employment safe, and no employer shall fail or neglect to do every other thing reasonably necessary to protect the life, health, safety and welfare of such employees or frequenters; and no such employer or other person shall hereafter construct or occupy or maintain any place of employment that is not safe.''

It will be noticed that the provisions of these sections are general and declaratory, for the question as to what is a safe place or safe employment remains for judicial determination, as

does also the question as to kind and character of safety devices and safeguards to be used and the methods and processes to be employed. All these depend upon the circumstances of each particular case and situation. A workshop, factory, mine or other place of employment can, in the nature of things, be made no safer than is reasonably consistent with the practical operation of the business being there conducted. Any other rule would impose unbearable and unreasonable and destructive burdens and restrictions upon industry of all kinds. Indeed, this view seems to have been in the mind of the Legislature at the time the act was passed, for paragraph 11 of Section 13 provides:

"The term 'safe' and 'safety,' as applied to any employment or place of employment, shall mean such freedom from danger to the life, health, safety or welfare of employees or frequenters as the nature of the employment will reasonably permit, including requirements as to the hours of labor with relation to the health and welfare of employees."

Whether a place is safe or dangerous depends largely upon how it is used. It may be said generally that if, from the character and condition of the place, a man of ordinary prudence would have reason to anticipate danger from its use, it is not safe within the meaning of the law. See *Atlantic Dock Co.* v. *Libby*, 45 N. Y., 499. The simplest appliance may be dangerous to a negligent and careless person, and the same is true of a place. A careless man may stumble over a chair in his own parlor and sustain injury. See *Barmore* v. *Railway Co.*, 85 Miss., 426.

In a recent case, *American W. M. Co.* v. *Schorling,* decided April 3d, 1915, by the Lucas County Court of Appeals, it appears that the defendant was a contributing employer, and that the plaintiff was engaged in removing a carload of lumber from a dry kiln. While passing by another car, the load of lumber upon the trucks shunted and caught him between the lumber and the wall of a building, causing an injury for which he brought suit. In his petition he alleged as negligence substantially:

1. Failure to furnish safe employment.

2.   Failure to furnish a safe place.

3.   Failure to provide and use safety devices and safeguards to prevent the lumber from falling.

4.   Failure to use methods and processes reasonably adequate to render the employment and place safe.

It will be seen that the acts of negligence charged are those mentioned in Sections 15 and 16 of the act of March 18, 1913 (103 O. L., 95). A demurrer was interposed to the petition in the court of common pleas, and overruled. The court of appeals held this was not error, and that the acts of negligence charged brought the case under the exception of Section 29 of the compensation act.

This decision, if good law, extends the ''lawful requirement'' exception to safe place and safe employment, safety devices, safeguards, and methods and processes reasonably adequate to render the employment and place of employment safe. This is going far, but as the doctrine is along the line of the general policy of the compensation act, and in the interest of humanity, we think it should be followed, at least until overruled by the Supreme Court. It does strike one, however, that, under the statement of facts, the doctrine of assumption of risk ought to be available to the employer. It will also be noticed that the doctrine of fellow-servant rule, which was available, might have been interposed to prevent recovery; for, if the lumber was negligently piled upon the trucks by a fellow servant, no recovery should have been allowed.

So it will be seen that there remains the question of what specific acts of omission or commission on the part of the employer constitute a failure to comply with lawful requirements so as to bring an employee within the exception or reservation under Section 29 of the compensation act; and this, we take it, must be determined by the court under the facts in each case. Of course, one employer, in the absence of a special order promulgated by the commission, can not be expected to use greater care than others in the same business under like circumstances; hence, only ordinary care will be expected in respect to these requirements; and the doctrine of *Cincinnati, etc., Ry. Co.* v. *Frye,* 80 O. S., 289, must be applied and that is—

"The employer is not an insurer or guarantor of the absolute safety of the place of work, but the limit of his obligation and duty in that behalf is to exercise reasonable and ordinary care, having due regard to the hazards of the service, to provide an employee with a safe place in which to perform his work."

It can not be held, without absolute danger to all industry, that an employer is an insurer of the place of employment, the safety of the employment, and safety devices or safeguards, unless they are specifically named, or the methods or processes employed unless they are specifically named by statute, for to so hold would be equivalent to saying that all industry should cease and all shops and factories close. If every act of negligence is to be held as a failure to comply with lawful requirements for the protection of the lives and safety of employees, so as to bring practically every injury within the exception or reservation of Section 29 of the compensation act, then the act has failed of its purpose and should be repealed at the first opportunity.

In the case of *Smith* v. *The Amercan Steel & Wire Co.*, now before us, it can not be said from the allegations in the petition that the place of employment was unsafe. If the plaintiff has a cause of action at all, it is because the employment at which the plaintiff was engaged when injured was not safe, or that there was a failure to use methods and processes reasonably adequate to render the employment safe; and under the facts as they may appear at the trial, the trial court will have to be the judge as to these matters.

The demurrer will be sustained.

Another case now before the court involves a very peculiar question. The plaintiff claimed that he was sent by his employer to a different place from the shop or factory to perform certain work, and while at the place designated, he was assaulted by a former employee of the employer who had been discharged or had voluntarily quit his employer by reason of a strike. The matter came before the court on a motion to make more definite and certain, which motion was granted for the reason that the court believed the plaintiff should state all the facts in the case so that a demurrer might be interposed.

The employer was a contributor to the fund. This case involves the question, is an employer liable to an employee for the malicious acts of a third person while in the performance of his duty? In this case the employee evidently was, at the time he was injured, in the course of empoyment.

While paragraph 1 of Section 13 of the act of March 18, 1913 (103 O. L., 95), makes the place of employment ambulatory, it is still only declaratory of the common law, for the place of employment always meant the place where the servant was directed to do or perform his work or where he was performing it. It is charged in the petition that the defendant knew the plaintiff would be assaulted and injured; but even if this is true, it is still not a wilful act unless the employer sent the plaintiff to the place purposely and with the direct object of having him assaulted. This is in effect the meaning of the amendment to Section 29 found in 104 O. L., 194. We are aware of no statute that requires an employer to send a guard or police officer with an employee sent from the shop to work temporarily at another place. If a man or number of men break into an employer's factory or shop and assault his workmen, can it be said the place is not safe within the meaning of the law?

If the employer may not, under Section 29 of the compensation act, plead assumption of risk in this case, still the doctrine of *volenti non fit injuria*—no wrong arising to one consenting—does apply. Assaults are not risks incident to a business within legal contemplation, unless committed by the employer; and, under the compensation act, such an assault would then be a wilful act, but even then it can hardly be said that the man, at the time he was assaulted, was in the course of employment, for if an employer assaults one of his workmen, he can not in any sense be then said to be an employer. A criminal act can not be a risk incident to a lawful business, but if men take the place of other men on strike, they consent to the dangers growing out of that situation. The plaintiff must be held to have known that there was a labor difficulty between his employer and his former employees. He knew as much about that situation as the employer; and as the employer may plead contributory negligence under Section 29 of the compensation act, we can see no possible

grounds for recovery.  Suppose no strike existed in this case, and that the plaintiff was assaulted by some stranger at his work, could he recover from the employer?  If not, will a mere allegation that the employer knew, when he directed him to go to that work, that he would be assaulted, state a cause of action within the exception of Section 29 of the compensation act?  If the act is a wilful act, yes; if not, no; and we have seen that such an act is not wilful unless the employer directed the employee to go to the place purposely and with the direct object that the assault would be committed.  It is not enough or sufficient to constitute a wilful act that the employer had in contemplation the assault as a possible result of the service, for under the compensation law, a wilful act is nothing less than a criminal act, and such is not alleged in this petition.  The only lawful requirement for the protection of citizens from assaults is that incumbent upon the civil authorities.  A common carrier is required to exercise the highest degree of care for the protection and safety of its passengers, but so far as protecting them from assaults and abuse by strangers is concerned, the law is well settled.

It is said in *Elliott on Railroads,* Volume 4, 2d Edition, Section 1591*b*, that:

"It may be said generally that a carrier is not, as to its passengers, charged with negligence in attempting to operate its cars during a strike of its employees, unless the conditions are such that it ought to know or ought reasonably to anticipate that it can not do so and at the same time guard its passengers from violence by the exercise of the utmost care on its part."  Citing 83 Minn., 237, and other cases.

The same authority says it is to be understood that a carrier is not a guarantor of the safety of its passengers under all circumstances.  See Section 1591.

The mere fact that the employer knew that some of his former employees might interfere with his workmen does not necessarily imply that a workman sent out to perform work at another place would be assaulted.  We think the allegations in this petition are not sufficient to state a cause of action.  That the plaintiff may have a cause of action if the conduct of the employer is charged

to be wilful, and that fact is proven, we are not deciding. To hold this defendant, under all these circumstances, would require us to hold that he is the insurer of the safety not only of the place where his employees worked, but of the whole city of Cleveland, because the employee sent out was in the course of employment while going from the factory to the place where he was directed to go, and it can not possibly be held that the employer was the insurer of the street, the street railway cars, or whatever conveyance the employee may have taken to reach the place where he was directed to go.

The demurrer will be sustained.

In a motion to strike out certain averments in a petition, the question, Is disability from occupational or industrial disease an injury within the meaning of the compensation act and related acts? is directly presented. The title of this case is not given, for the reason that the pleader, instead of alleging failure to furnish safe employment or the failure to comply with lawful requirements, or to use methods and processes reasonably adequate to render the employment and place of employment safe, stated in general terms and quite voluminously that the plaintiff was disabled by reason of conditions described.

All of Section 1 of the act of May 6, 1913 (103 O. L., 819), and all of Sections 15 and 16 and much of Section 13 of the act of March 18, 1913 same volume), are set forth verbatim in the petition. We found it impossible to strike out, and leave any averment stating a cause of action in the petition. We therefore treated the motion to strike out as a demurrer and sustained it.

One David Brown, an employee of the Eagle White Lead Company of Cincinnati, made application for an award for compensation to the state liability board of awards in September, 1913, claiming that he was disabled on August 26, 1913. His duty was to charge and draw kilns used in the manufacture of white lead, and he claimed that in the performance of this duty he was taken sick with lead colic and was confined in a hospital until September 26, 1913. The Eagle White Lead Company employed more than five workmen regularly in its business and was a contributor to the fund. The industrial commission, successor of the

state liability board of awards, disallowed the claim for compensation January 2, 1914, for the reason that the disease was not an injury within the contemplation of the law of the compensation act of June 15, 1911. An appeal was taken to the common pleas court. It will be noticed that the claim arose under the compensation act, as has been said, of June 15, 1911, and Brown's disability arose before the act of May 6, 1913 (103 O. L., 819), went into effect, as that act did not go into effect until October 1, 1913. This latter act, by its title, is "An act for the prevention of occupational diseases with special reference to lead poisoning" and does in positive terms prescribe "Lawful requirements for the protection of the lives and safety of employees engaged in the manufacture of that product." So it will be seen that the question before the common pleas court on the appeal was to hold or not to hold that lead poisoning was an injury within the scope or meaning of the compensation act of June 15, 1911. The court held it was an injury. See Volume 12, Ohio Law Reporter, May 16, 1914. In this the court was sustained by the Hamilton County Court of Appeals, Volume 12, O. L. R., January 23, 1915. Both opinions show much learning and careful research. We think, however, that the doctrine of liberal construction is carried in these decisions to the extreme limit in advancing the remedy by including cases without the letter, but possibly within the reason of the statute. As we have seen, the policy or *raison d' etre* of the workmen's compensation act is to advance the public welfare by minimizing accident and personal injury litigation and to tax industry for the purpose of directly compensating those who are injured and the dependents of those killed in its pursuit. That those who are disabled by occupational or industrial diseases should be compensated as well as those sustaining bodily injury, can not be denied. Recognizing this undeniable fact, the framers of the Constitutional Amendment of September, 1912 (Section 35, Article II), gave the Legislature power to provide "Compensation to workmen and their dependents for death, injury or occupational diseases occasioned in the course of such workmen's employment." But nowhere in the compensation act subsequently passed March 14, 1913, are the words "occupational disease"

mentioned. It would seem that where a grant of power to do two or three sepearate and distinct though cognate and related things is given the Legislature, and the grant is exercised in relation to only one or two of these things and is ignored as to the third, that the Legislature refused to exercise the power as to the thing ignored. Just why the Legislature failed to provide compensation in express terms for the victims of occupational disease is difficult to understand. We can only say it is one of the inefficiencies indicating the incompleteness and want of harmony so strikingly noticeable when the act is carefully read.

*In re Hurle,* 104 N. E., 336, is cited by the common pleas court and Court of Appeal of Hamilton County in support of the contention that disease is an injury. In that case compensation was allowed under the Massachusetts Compensation Act for loss of vision resulting from an acute attack of optic neuritis caused by coal tar gases, but the facts show that the noxious gases were thrust into the face of the disabled workman, and the disability did not arise from slow and gradual absorption of poisonous substances. Even in the Brown case, decided by the common pleas court and the court of appeals, it appeared Brown was suddenly taken with lead colic while at work. There are some occupational diseases that are undoubtedly injuries, such as caison disease, which results from an injury to bodily tissue owing to a too rapid locking out or release of air pressure; but to say that an occupational disease where no lesion occurs, and which may be developing for years before disability takes place, is an injury is substituting judicial construction for legislation, and this is an exceedingly dangerous exercise of judicial power.

The word injury in its legal signification may mean any unlawful act in derogation of another's right, but there is a clear distinction between injury in this sense and personal injury as that phrase is generally understood. Injury in the latter sense means a hurting or wounding which does not result in death *(Williams* v. *State,* 2 O. C. C., 292). Personal injury is an injury to the person, as an assault is distinguished from an injury to property *(Terre Haute Railroad Co.* v. *Lauer,* 52 N. E., 703; 21 Ind. App., 466). In an accident policy it is held to mean bodily injury. *Theobald* v. *Railway Passenger Assurance Co.,* 26 Eng. L. & Eq., 432.

Disease is defined to be any derangement of the function or alteration of the structures of the animal organs, or a morbid condition resulting from some functional disturbance or failure of the physical functions which tend to undermine the constitution. *Peterson* v. *Modern Brotherhood of America,* 161 N. W., 281-291; 125 Ia., 562. See 67 L. R. A., 631.

There are many occupational diseases which fall directly within this definition, and can in no sense be termed personal injuries.

In the English Compensation Act, the word accident is used as well as the word injury. English courts divided upon the question whether occupational disease was included in these terms; and in consequence of this disagreement between the courts, the act was amended so as to specifically include certain occupational diseases. The general terms of the act are not changed by the amendment, but the amendment provided for compensation "as if the disease  *  *  *  were a personal injury by accident arising out of and in the course of that employment."

In reading those decisions which hold that occupational disease is an accident or injury, we are struck with the fact that the warp of the reasoning is much finer than the woof of the argument. We are not finding fault with the decision in the David Brown case, as such decisions are humanitarian in character and in consonance with the general policy of compensation acts; but the Legislature should not thrust upon the court a duty which it negligently or for other reasons failed to perform.

We trust the industrial commission will prepare for submission to the next General Assembly an efficient compensation act consistent, complete and harmonious, embracing all that is good in the several acts now in force, including occupational diseases as injuries or accidents, and eliminating absurdities and crudities now so apparent, so that its construction and enforcement will be a pleasure to the commission and to the courts.

The case of *Berry* v. *The Ideal Paper Box Company* is also before the court on demurrer. When Berry was injured he was a minor of about nineteen years of age, but was *sui generis* at

the time he brought this action and is suing in his own name. He says defendant employs regularly more than five workmen in his business, and that it is a subscriber to the state insurance fund. He says further that he filed an application with the state liability board of awards, and was awarded compensation in the sum of $53.30; but he claims that when he received this sum he was a minor, and did not know the nature and extent of his injury; that he is now dissatisfied with this award, and repudiates and disaffirms the action taken in obtaining it.

When this award was made, the act of June 15, 1911, was in force. If the case arose under the present compensation act, there would be no difficulty in the premises, for by Section 46 of this act it is provided that ''a minor working at an age legally permitted under the laws of this state shall be deemed *sui juris* for the purpose of this act; and no other person shall have any cause of action or right of compensation for an injury to such minor workman. But in the event of an award of a lump sum of compensation to such minor employee, such sum shall be paid only to the legally appointed guardian of such minor.''

We think it quite clear that the general purpose of the first act, or the act of June 15, 1911, in this regard is practically to the same effect, for under Section 21-2 it is provided that ''every employee who makes application waives his right to exercise his option to institute proceedings in court.''

This provision seems to be not limited. There is no contention but that at the time Berry was injured he was a person ''of an age legally permitted under the laws of this state'' to work in factories or workshops.

By Section 35 of the act of June 15, 1911, it is provided that the benefits or compensation arising under the act ''shall be paid only to the employees or their dependents.'' In cases under the workmen's compensation act of England this question arose, the act being silent upon the question here involved. In *Neale* v. *Electric & Ordnance Company*, 2 K. B., 558-566 (1906), it appears that an infant brought suit by his next friend, and afterwards applied for compensation under the workmen's compensation act. The court said:

"The question here is, not as to the validity of a contract made by an infant, but as to his estoppel by reason of proceedings taken in an action. I can not see any ground for the suggestion that the plaintiff, because he is an infant, is in any other or better position than that in which an adult would have been in an action in which he was plaintiff had it resulted in the same way as the action in the present case."

The same view was taken by English courts in other cases.

In a case recently decided by the Supreme Court of this state it appears that one William Zilch, a minor, by his next friend, brought an action against one Baumgartner in the court of common pleas, claiming that he sustained an injury on the 6th of June, 1913, which was due to the negligence of the defendant in failing and neglecting to guard a circular saw, which, as has been seen, is made an absolute and positive duty by Section 1027, General Code. It appears from the record—and this is uncontradicted—that the plaintiff, a few days after he received the injuries complained of, made up and signed and sent to the state liability board of awards an application for compensation as provided in the compensation act. It is provided by the rules of the board (now commission) that should an applicant fail to prosecute his application as prescribed by the rules within two weeks after giving notice, the Board may consider that such injured person has waived his right to compensation and make a finding accordingly, which in this case the board did and disallowed the claim. The fact, however, that an application had been filed for compensation under the act was pleaded as a defense in the court of common pleas, but was disallowed by the court, and a judgment was rendered, which was reversed by the court of appeals [19 C.C.(N.S.), 438] for the reason that the plaintiff had waived his right to institute legal proceedings by filing his application with the board. The Supreme Court held, in a per curiam [91 Ohio State, 205], that the State Board of Liability Awards was not warranted in holding that the plaintiff had waived his right to compensation from the insurance fund, in accordance with their rule 9; but the court also held that, having made this application for compensation from the insurance

fund, the plaintiff waived his right to exercise his option to institute legal proceedings in court; and the judgment of the court of appeals in reversing the judgment of the court of common pleas was sustained and upheld.

The record in this case clearly shows that the question of minority was before the court of appeals and before the Supreme Court, and the holding under the circumstances that the plaintiff waived his right to institute legal proceedings by filing his application for an award from the state insurance fund must be considered as decisive on the question that, even under the law of June 15, 1911, a minor of an age legally permitted under the laws of this state to work in factories and work-shops is *sui juris,* and therefore the demurrer will be sustained.

*Skof* v. *Victor R. Brown Company* is before the court on a motion to strike out an allegation that the employer had not availed itself of the provisions of the workmen's compensation act by paying the premiums as provided in the statutes of the state of Ohio.

This question was before the Superior Court of Cincinnati May 19, 1913. See 12 O. L. R., 575. Pugh, J., said:

"An allegation that the defendant employs five or more workmen in the same business and has failed to subscribe to the state insurance fund for injured employees, sets out facts showing that the defendant is subject to the provisions of the workmen's compensation act, and will not be stricken out as irrelevant."

It must be remembered that there are at least three classes of employers; first, those who do contribute to the fund; second, those who do not; third, those who are direct compensators; and possibly a fourth, those employing less than five workmen who do contribute to the fund. The remedy is different as to some of these classes, as has been pointed out. If an employer is not a contributor to the fund, an action may be instituted as if the act did not exist; and not only that, but the employer is denied the defenses of the fellow-servant rule, contributory negligence, and assumption of risk; while if an employer is a contributor or is a direct compensator, then no action can be instituted against him

unless the cause of action or the injury is the result of wilful act or failure to comply with a lawful requirement for the protection of the lives and safety of employees. So that it will be seen that allegations of the kind in the Skof case are material and ought to be pleaded, and the motion to strike out will be denied.

The words "purposely self-inflicted" mean precisely what the words in the ordinary sense imply, and that is, that the man intentionally and purposely injured himself in order that he might recover compensation or damages. This, of course, does not include cases of suicide. The purposely self-inflicted injury in this sense is the same, by analogy, as the case of a soldier who purposely wounded himself that he may avoid battle or receive a pension. A man's negligence may be so gross that it may be said to be wilful; still, if the injury is not self-inflicted for the purpose indicated, it is only negligence, no matter how reckless or gross it may be.